# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-KA-01202-SCT

*TRAVARIS RICHARD CHRISTIAN a/k/a*
*TRAVARIS R. CHRISTIAN a/k/a TRAVARIS*
*CHRISTIAN a/k/a TREVARIS RASHAD*
*CHRISTIAN*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/30/2013 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| TRIAL COURT ATTORNEYS: | TOM KESLER |
| | KIMALON CAMPBELL |
| | ALISON KELLY |
| | ALICE STAMPS |
| | MICHAEL HENRY |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | EMIL NICK CRAWFORD |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | ROBERT SHULER SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/10/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, C.J., LAMAR AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     Travaris Christian was convicted in the Hinds County Circuit Court on two counts of

capital murder (underlying felony of robbery); one count of house burglary, conspiracy to

commit house burglary, felonious child neglect, and felon in possession of a firearm–all

offenses having occurred on or about January 24, 2011.  Christian appeals, claiming his

constitutional rights to confrontation were violated; his convictions are supported by insufficient evidence; and the trial court erred in granting the State an aiding-and-abetting instruction and denying him an abandonment instruction. Finding no merit in any of the issues raised, we affirm Christian's convictions.

**FACTS**

¶2. On January 26, 2011, Hinds County Sheriff's Deputy John Sanders was dispatched to 1323 Timberidge Road in Terry, Mississippi, to conduct a welfare check and make contact with Robert Carter. Carter's vehicle had been found abandoned at a location in Jackson, Mississippi. Upon arrival at the Terry home, Deputy Sanders proceeded to the door inside the garage and rang the door bell. When no one answered, and finding the door unlocked, Deputy Sanders entered the home.

¶3. Inside, Deputy Sanders discovered two deceased bodies, later identified as Carter and Carter's fiancé, Renita Marks. Carter's body was found in the home's dining room, and Marks's body was discovered behind the door to the master bedroom. Also found, lying face down on the floor near Carter's body and crying, was Carter's and Marks's seven-month-old son, Carter, Jr. The baby's diaper was soiled with "a lot of feces."

¶4. Deputy Chris Smith, who responded to the scene shortly after Deputy Sanders, testified at trial that when he picked up the baby, he appeared in a "very bad state." He said the baby appeared extremely hungry and thirsty. He changed the baby and fed him from "premade bottles" found in the home's refrigerator. Deputy Smith handed the baby over to one of the female officers who subsequently had arrived at the scene.

2

¶5.    Investigator Greg Lewis of the Hinds County Sheriff's Department testified that he recovered nine, nine-millimeter spent casings in the home. Two projectiles were obtained from Carter's body. And two projectiles were found near Marks's body, one in her clothing and another on the floor. A bullet hole was discovered in the master bedroom door, indicating that someone had shot through the door. Investigators determined that the shootings had occurred on the evening of January 24, 2011.

¶6.    Two days after the shootings, Hinds County Sheriff Investigators arrested Christian, along with Deon Carter, at the home of Rhonda Shannon, Christian's aunt. Deon was Carter's brother.

¶7.    While in custody, Christian waived his right to an attorney and volunteered three separate statements to investigators. In his first statement, Christian denied being in Terry the day of the killings and denied any involvement in the case. He told investigators he had met Deon just "three days" ago at Shannon's house, where Deon was staying. Christian said Deon was looking to sell a "black truck," and he rode with Deon to a pawn shop, where Deon pawned an air compressor. Christian told investigators that he "heard something had happened in Terry and that someone was dead." Christian recalled that when he first met Deon at Shannon's home, Deon was arguing on the phone with someone from Terry. After the phone conversation, Deon told Christian this person had "really . . . f***ed over him." And "[t]hey" had "kicked him out" of his home. Christian told investigators this was all he knew about the matter, at which point the interview ended.

¶8.     Christian gave another statement shortly thereafter.  Again, Christian said he had met Deon just "three days ago" at Shannon's home.  Deon was arguing on the phone with his brother, who apparently had done Deon wrong.  After the phone conversation, Christian rode with Deon to Robert's home in Terry.  According to Christian, they rode there in a gray Buick.  When they arrived, Deon went up to the home to talk to his brother, while Christian sat in the car.  According to Christian, Deon and his brother had a conversation that lasted for about five to ten minutes.  Christian heard Deon say to Carter, "man, I'm out of gas man, you got the money ready for me?  And, . . . the brother was like, man just put the keys on the table. . . ."  The brothers then went inside the house.  Next, Christian heard gunshots.  At that point, Christian got out of the car and ran down the street.  Sometime afterward, Deon drove up to Christian in a black truck.  Christian got in the truck, and Deon drove them back to Shannon's house.  While in the truck, Deon was "swinging the gun around," which scared Christian because it made him feel like Deon might shoot him "over somethin[g] like this."  Deon told him, "I hate to do my brother like that, but he just messed over me man."  Christian said a "50, 52" inch big-screen television was in the bed of the pickup, which Deon later sold to Shannon.  Investigators asked Christian how the gray Buick they took into Terry arrived back at Shannon's house in Jackson.  Christian said, "I guess they went back and got it."  Investigators then asked Christian to describe the gun used in the shootings.  Christian said, it was a "chrome and black [45]."  Christian said Deon gave the gun to "Bo PeeP" after the shootings.

4

¶9. In his third statement, Christian told investigators that, on the day of the shooting, Deon had told him that his brother had some "TV's in his house" and he needed some help carrying them out. Christian's uncle, Alonzo Christian, drove Christian and Deon in the gray Buick to Carter's house and dropped them off. Christian stated, "We went behind the house, and I went in the woods and he went and knocked on his brother's door. And . . . when his brother came to the door[, t]hey went to talkin.'" Later in his statement, Christian told authorities he and Deon "went up the side of the house." Deon told Christian, "stand right here, I'm fixin' to go knock on the door." Deon knocked on the door, and Deon and Robert "went to talkin.'" Christian said that, prior to going to Terry, Deon had told Christian that Carter was at work and would not be home. When Carter came to the door, Carter and Deon began arguing about gas money. Deon told Carter he needed gas money. Carter refused and instructed Deon to put the keys to the Buick on the table outside. According to Christian, Carter "tended to close the door," and that is when Deon started shooting. Deon shot through the glass door, and "busted up in there." Christian said, at this point, he took off running. While he was running, Christian heard more gunshots–three more, then two. He said Deon picked him up down the street about twenty minutes later; Deon had a big-screen television and an air compressor in the back of the truck. They drove back to Shannon's house in Jackson. When they arrived, Alonzo came out and helped Deon carry the television inside. The next day, Christian rode with Deon to the pawn shop to sell the air compressor. According to Christian, Deon had agreed to give Christian some of the proceeds from sale. After the sale, Deon gave Christian $30.

¶10.    Alonzo testified at trial on the State's behalf in exchange for a plea deal. According to Alonzo's testimony, Deon had approached Alonzo prior to the shootings and had told Alonzo that "he had a lick," and asked Alonzo if he was interested. Alonzo told Deon, "I don't do . . . licks," and "never will . . . ." Alonzo then told Deon that he had a nephew (Christian), that "probably will . . . ." Alonzo then introduced Deon to Christian. On the evening of the shootings, Alonzo gave Deon and Christian a ride to Carter's house in Terry. Alonzo's understanding was that Deon and Christian were going to break into Carter's home, since Robert was out of town. Alonzo dropped the two off at Carter's house in Robert's Buick and drove the car back to Shannon's house in Jackson. Alonzo indicated that Deon told him it was okay for Alonzo to leave because they would have a ride back from Carter's home. According to Alonzo, Deon and Christian arrived back at Shannon's house with "nothing." Deon and Christian then left for "about an hour." When they returned, they had a television in the back of the truck. Alonzo helped one of them–he could not remember which one–take the television off the truck and into Shannon's house.

¶11.    Shannon also testified at trial on behalf of the State. According to her testimony, she met Deon through Alonzo sometime in December 2010. Deon ended up staying at Shannon's home because he had no place else to go. Shannon said she did not find out about the shootings until Wednesday morning, on January 26, 2011. Deon came to her house early that morning, asking about Christian. Shortly thereafter, Shannon went and picked up Christian and Christian's girlfriend. Christian told Shannon that when he and Deon went down to Terry, "it was just suppose[] to be a burglary." But, Deon "ended up" shooting "his

6

brother." Christian said "he was scared and didn't know what to do because [Deon] was pointing the pistol . . . . And so he went in and, you know, I guess whatever and however that went, I don't know I wasn't down there, but he was just saying how the boy had killed his folks, you know, and they [were not] suppose to be there."

¶12. According to Shannon, prior to the shooting, while Deon was staying at her house, Deon had told them that Carter had a lot of nice things. Carter allegedly had done Deon and their mother wrong by kicking them out of his house because they could not get along with Marks. And Deon said he was going to do something to Carter for doing them wrong.

¶13. Shannon also testified that the day after she was taken in for questioning on January 26, she found a box with a gun in it atop a coat rack in her home. She informed authorities, who came and retrieved the weapon and placed it into evidence.

¶14. Forensic scientist Felicia Robinson testified that the shell casings recovered from the crime scene matched the gun in evidence, which had been retrieved from Shannon's home.

¶15. Investigator Eric Zetterholm of the Hinds County Sheriff's Department testified at trial that he was one of the investigators who had interviewed Christian the day Christian was arrested. Investigator Zetterholm testified he had found a cell phone in Christian's pocket while booking Christian, which Zetterholm discovered the next day had belonged to Marks.

¶16. Zetterholm also testified about a recorded jail telephone conversation between Christian and his mother or grandmother.[1] That person informed Christian that the police

---

[1]In his testimony, Zetterholm indicated that Christian was talking either to his grandmother or his mother. The record does not indicate which person with whom Christian spoke and the recording is not in the record.

had retrieved a gun from Shannon's house. According to Zetterholm, when Christian learned this information, he said that the gun was used in the shootings. Christian told the person during the phone conversation that he was the last person to touch the gun and his fingerprints were all over it.

¶17. Renita's twin sister, Renata Marks, testified that the cell phone recovered from Christian belonged to Renita. She also told the jury that at the time of the shootings, Carter's and Renita's baby was seven to eight months old; the baby was three years old at the time of trial.

¶18. Christian did not testify at trial. He put on one witness, Kindell Ard. Ard knew Carter and Deon, and he said he had talked to Carter on the phone the night of the shootings. According to Ard, during his and Robert's conversation, Carter had said someone was knocking on his window. Ard then heard arguing in the background and a baby crying. Afterward, the phone went silent. Ard did not hear any glass breakage or any gunshots.

¶19. The jury found Christian guilty on all charged counts. He appeals, raising the following issues:

1. **Whether Christian's federal and state constitutional right to confront witnesses was violated when the trial court allowed a pathologist to testify and offer opinions about the autopsy instead of the pathologist who actually conducted the autopsy.**

2. **Whether the evidence is insufficient to support the verdicts and the verdicts are against the overwhelming weight of the evidence.**

3. **Whether the trial court erred in granting the State's jury instruction on accomplice liability.**

8

**4. Whether the trial court erred in rejecting the defendant's jury instruction D-3, abandonment of a criminal enterprise.**

**5. Whether the cumulative effect of errors requires reversal.**

¶20. Additional facts, as necessary, will be related in our analysis.

**1. Whether Christian's federal and state constitutional right to confront witnesses was violated when the trial court allowed a pathologist to testify and offer opinions about the autopsy instead of the pathologist who actually conducted the autopsy.**

¶21. At trial, over Christian's objection, the State tendered Dr. Erin Barnhart as an expert in the field of pathology from the Mississippi State Medical Examiner's Office. Dr. Barnhart did not participate in any respect in the victims' autopsies. Both autopsies were performed by Dr. Adel Shaker, who did not testify, and who was no longer working at the Mississippi State Medical Examiner's Office. Dr. Barnhart testified that, although she did not perform the actual autopsy procedures, she examined the autopsy reports, along with the photographs and case notes. And she concluded based on a reasonable degree of medical certainty that Carter and Marks died from gunshot wounds. We find no violation.

¶22. At the outset, we need to point out that the Court of Appeals recently addressed similar testimony by Dr. Barnhart in ***Bufford v. State***, 191 So. 3d 755 (Miss. Ct. App. 2015). There, the defendant was charged in the shooting death of Davie Miller, and Dr. Shaker had performed Miller's autopsy. And like here, Dr. Barnhart testified at Miller's trial, having reviewed "Dr. Shaker's case notes and photographs." ***Id***. at 757-59, 763. The Court of Appeals found no Confrontation Clause violation. ***Id***. at 763.

¶23. Quoting this Court's decision in **Debrow v. State**, 972 So. 2d 550, 554 (Miss. 2007), the Court of Appeals found that "[w]hen the testifying witness is a court-accepted expert in the relevant field who participated in the analysis in some capacity, . . . then the testifying witness's testimony does not violate the Confrontation Clause." **Bufford**, 191 So. 3d at 762. **Bufford** further added that this Court has held that "a supervisor, reviewer, or other analyst involved may testify in place of the primary analyst where that person was 'actively involved in the production of the report and had intimate knowledge of analyses even though he or she did not perform the tests firsthand.'" **Id**. at 763 (quoting **Grim v. State**, 102 So. 3d 1073, 1081 (Miss. 2012)). While our analysis in **Debrow** was correct, the Court of Appeals misapplied it to the facts of the case before it.

¶24. **Debrow**[2] and **Jenkins v. State**[3] (which the Court of Appeals also cited) both considered situations in which one expert performed a scientific test and the test results, themselves, were admitted in evidence through the testimony of another. In those cases, this Court's analysis centered on whether the testifying expert was involved in the testing process sufficiently to satisfy the Confrontation Clause.

¶25. Because Dr. Barnhart—according to her own testimony—did not participate in any manner in the autopsies and, in fact, never spoke with Dr. Shaker about the autopsies, the

---

[2] **Debrow**, 972 So. 2d at 553 ("Debrow also argues that the admission of the results of his blood analysis violated his Sixth Amendment right to confrontation, as the State provided no foundation for the submission of this evidence.").

[3] **Jenkins v. State**, 102 So. 3d 1063, 1065 (Miss. 2012) ("Jenkins contends that his Sixth Amendment right to confrontation was violated because he was not provided an opportunity to cross-examine the analyst who had performed the testing on the substance and authored the forensic report admitted as evidence against him.").

cases cited by the Court of Appeals are inapplicable to the scenario at issue here and before the Court of Appeals in **Bufford**.

¶26. But, as was the case in **Buford**, Dr. Shaker's notes were not admitted in evidence, and Dr. Barnhart did not relay the content of those notes through her testimony. Instead, while Dr. Barnhart did state that she had reviewed the notes, she indicated that her expert opinions were her own and would have been the same had she relied solely on the autopsy photographs. Thus, we do not find that Dr. Barnhart served as a mere conduit for the content of Dr. Shaker's notes. *Cf.* **Bullcoming v. New Mexico**, 564 U.S. 647, 131 S. Ct. 2705, 2709, 2713-15, 180 L. Ed. 2d 610 (2011) (holding that the surrogate testimony of a lab analyst who was familiar with the laboratory procedures but had not completed the testing on the defendant's sample violated the defendant's rights under the Confrontation Clause).

¶27. We find no Confrontation Clause violation occurred in this instance. Therefore, this issue is without merit.

> **2. Whether the evidence is insufficient to support the verdicts and the verdicts are against the overwhelming weight of the evidence.**
>
> **3. Whether the trial court erred in granting the State's jury instruction on accomplice liability.**

¶28. Because issues two and three interrelate, we discuss them together.

¶29. Christian contends there is insufficient evidence to sustain a conviction on any of his charges. Christian also argues that the verdicts were against the overwhelming weight of the evidence.

11

¶30. We find the State presented sufficient evidence in support of each conviction. We also find the weight of the evidence does not preponderate against the verdict so as to sanction an unconscionable injustice. The capital-murder, felon-in-possession-of-a-firearm, and felonious-child-neglect convictions are the only ones that warrant discussion.

¶31. "In reviewing a challenge to the sufficiency of the evidence, [this Court] determines whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *Wales v. State*, 73 So. 3d 1113, 1120-21 (Miss. 2011) (citing *Bush v. State*, 895 So. 2d 826, 843 (Miss. 2005)). The evidence is sufficient if it "is of such quality and weight that, 'having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense.'" *Id.* (citing *Bush*, 895 So. 2d at 843). The Court will reverse and render "if the facts and inferences, properly considered, 'point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty.'" *Id.* (quoting *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985)).

¶32. When the weight of the evidence is challenged, this Court "will reverse only when the verdict [is] so contrary to the weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Wales*, 73 So. 3d at 1121 (¶ 23) (citing *Bush*, 895 So. 2d at 844).

**Capital Murder**

12

¶33. Christian contends that the evidence shows only that he was present at Carter's home before Deon shot and killed Carter and Marks; it does not demonstrate that he participated in the shooting and killing. Christian acknowledges on appeal that he told authorities he went up to the home with the intent to aid Deon with the house burglary; but there was no evidence that he planned, aided, abetted, or participated in a robbery. Christian maintains that he told authorities he had agreed to go with Deon to help remove a television from Carter's home, with the understanding that no one would be home, and when the shooting started, he ran away. He argues that to be guilty as an aider and abettor, one must do something that incited, encouraged, or assisted the actual perpetrator in the commission of the crime. Christian further contends that the State presented no evidence to satisfy the elements of robbery, to wit: that he or Deon took or attempted to take property "from the person," "against the person's will," by either "violence to the person" or "by putting the person in fear of immediate injury to his person."

¶34. Christian was charged and convicted on two counts of capital murder with the underlying predicate felony of robbery or attempted robbery. Mississippi Code Section 97-3-19(2)(e) states that "[t]he killing of a human being without the authority of law by any means or in any manner shall be capital murder . . . [w]hen done with or without any design to effect death, by any person engaged in the commission of . . . robbery." Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2014). Mississippi Code Section 97-3-73 defines robbery as follows: "Every person who shall feloniously take the personal property of another, in his presence or from his person and against his will, by violence to his person or by putting such person in fear of

13

some immediate injury to his person, shall be guilty of robbery." Miss. Code Ann. § 97-3-73 (Rev. 2014). By this definition, there are three essential elements of robbery: "(1) felonious intent, (2) force or putting in fear as a means of effectuating the intent, and (3) by that means taking and carrying away the property of another from his person or in his presence." *Goff v. State*, 14 So. 3d 625, 647 (Miss. 2009).

¶35. The facts of this case show that Christian and Deon went to Carter's home with the felonious intent to break, enter, and steal. Carter and Marks were home at the time. An argument ensued between Carter and Deon about money. Deon shot through the glass door after Carter attempted to close it, and Deon entered the home. Carter and Marks were shot and killed, and property belonging to both victims was taken from their home. Christian shared in the spoils from the taking. And Marks's cell phone was discovered on Christian's person by authorities after he was taken into custody two days after the shootings.

¶36. These facts belie any contention that this was not a planned burglary, that escalated into robbery, that escalated into murder against two victims by Deon. The question for consideration is whether the evidence supports the jury's finding Christian equally culpable for Deon's actions beyond burglary and conspiracy to commit burglary, both of which Christian admitted to authorities he had committed.

¶37. Mississippi has long recognized the rule that, "Where parties combine to commit crime, the law imputes the guilt of each to all thus engaged, and pronounces all guilty of any crime committed by any, in the execution of the common purposes, as one of its natural and probable consequences, even though none of the parties intended at the outset to do the

14

particular thing constituting the crime." ***Lusk v. State***, 64 Miss. 845, 850, 2 So. 256, 257 (1887). But, "[i]f the act is not the natural and probable outcome of the common design, but is the independent act of some of the party, conceived of by them, and outside of the common purpose, those not participating in it are not responsible for this independent act." ***Id***.

¶38. Christian contends the latter principle applies. He points to his statement to authorities, evincing that, even though he agreed to help Deon burglarize Carter's home, he did so with the understanding that Carter would not be there. However, the prosecution presented countervailing evidence that allowed the jury to reject this claim.

¶39. In Christian's second statement to authorities, he said that when he first met Deon at Shannon's house, Deon was arguing on the phone with his brother from Terry. Christian then made the following statement: "And when this was, I ain't sure [of the] date, but we rode down there. He [was sup]pose[] to . . . get[] some gas money and all this from his brother. We rode down there, in the gray Buick."

¶40. In his third statement, Christian said Carter was not supposed to be there. Christian also gave two different accounts as to what he did after he and Deon walked up to the house. Christian first said he had walked with Deon up to the side of the house and then had walked straight into the woods while Deon walked up to the door. Later, in his third statement, Christian said that when he and Deon walked up to the house, Deon had told him to "stand here," and Deon then had walked up to the door and knocked.

¶41. Fundamentally, the jury may consider any evidence presented at trial. It "may accept the testimony" or statements "of some witnesses and reject that of others, and may accept in

15

part and reject in part the testimony" or statement "of any witness, or may believe part of the evidence on behalf of the [S]tate and part of that for the accused, and the credibility of such witnesses is not for the reviewing court, but only for the jury." **Bond v. State**, 249 Miss. 352, 357, 162 So. 2d 510, 512 (1964).

¶42.   In **Woodward v. State**, 166 Miss. 596, 143 So. 859, 860 (1932), this Court affirmed a coconspirator's murder conviction, where a shopkeeper was robbed and killed "in the night-time in a store owned by him, and adjoining which was a bedroom occupied by him." The evidence in **Woodward** presented four theories, which the Court described as follows:

> (1) That the appellant and Will Dixon entered the store at night, as aforesaid, for the purpose of larceny, and while thus engaged they were surprised by the entry into the store of the deceased, who threw a flash-light upon the parties, and that thereupon the appellant beat the deceased to death with an iron twine stand which was a part of the store equipment. We think under all the evidence the theory just stated is improbable. (2) That in the same situation as above stated Will Dixon did the killing, appellant being actually present. (3) That appellant, who was an employee at the store, and who was present at the time the store was closed at 10 o'clock, did by a prearranged plan with Dixon leave the back door open, so that Dixon could enter noiselessly, as it was calculated, and that appellant thereafter kept watch at the front of the premises; but that Dixon, who entered the store, did not succeed in doing so without noise, and that the deceased, hearing the noise in the store, went from his bedroom to the store room adjoining, and having, by the aid of a flash-light, discovered the said Dixon, the latter murdered the deceased in the manner above mentioned. (4) That by the said prearranged plan appellant left the back door open, and appellant thereupon departed, and was not within the immediate neighborhood of the store at the time of the entry and killing by Dixon, and that the conspirators met some hour or two after the homicide and divided the money at a point remote from the store.

*Id*. at 859-60.

¶43. The appellant's contention on appeal in ***Woodward*** was that the jury could not find him guilty of murder if it believed the fourth theory. ***Id***. at 860. This Court disagreed, reasoning as follows:

> [I]f the verdict was based on the theory of a conspiracy the least that could have been considered by the jury in that respect was that the coconspirators had agreed to a larceny of a small store building in the adjoining room to which it was known by them that the proprietor of the store was present, and that it was more than remotely possible, even if we are not to say probable, that the said proprietor would hear the noise which would likely be made in working at such a crime in the dark, and would at once go into the store to search for the cause of the noise, and would intercept any persons there present in the commission of the larceny.

***Id***. ***Woodward*** reiterated:

> In such a situation the great weight of authority is . . . that the coconspirators are equally guilty of murder which directly results from the discovery and the resistence to the crime being committed as originally planned, although the murder, as a part of it, had not been actually agreed upon, and had not[ i]n fact, been taken into consideration.

***Id***.

¶44. In the case before us, the jury was instructed with the aiding-and-abetting jury instruction adopted by this Court in ***Milano v. State***, 790 So. 2d 179, 182 (Miss. 2001), from the Fifth Circuit Court of Appeals Pattern Jury Instruction on Aiding and Abetting. The instruction reads as follows:

> The guilt of a defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished by that person through the direction of another person as his or her agent, by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.

17

If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such conduct.

Before any defendant may be held criminally responsible for the acts of others it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

In other words, you may not find any defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant voluntary participated in its commission with the intent to violate the law.

¶45. The trial court did not err in granting this instruction. The State's evidence against Christian sufficiently permitted the jury to conclude he was more than just present or just a knowing spectator at Carter's home when the robbery and killings occurred.

¶46. Again, Christian, by his own admission, entered into a plan with Deon to assist him in taking property belonging to Carter from Carter's home. Contrary to his claim otherwise, there is evidence that Christian did so with the understanding that Carter or someone else likely would be present at the time. Given this circumstance, there was more than a remote possibility their plan would be met with resistance. *Woodward*, 166 Miss. 596, 143 So. at 860.

¶47. Whether Christian actually ran or not when the shooting started was a question for the jury to contend with. The jury may have rejected this claim based on the fact that the

18

property of one of the victim's (Marks's cell phone) was found on Christian's person after he was arrested.

¶48.    As we reiterated in *Goff*, 14 So. 3d at 647, "[P]ossession of a deceased's property creates a reasonable inference that the property was stolen." (Quoting *Spicer v. State*, 921 So. 2d 292, 312 (Miss. 2006), *abrogated on other grounds* by *O'Connor v. State*, 120 So. 3d 390 (Miss. 2013); *cf. Wilson v. United States*, 162 U.S. 613, 16 S. Ct. 895, 40 L. Ed. 1090 (1896) ("Possession of the fruits of crime, recently after its commission, justifies the inference that the possession is guilty possession, and . . . that there is a like presumption in the case of murder accompanied by robbery."). In *Knox v. State*, 805 So. 2d 527, 531-32 (Miss. 2002), we held that, "when the defendant is discovered with the personal property of the deceased on his person it is entirely within reason for the jury to find that this fact in itself constitutes robbery."

¶49.    Or the jury may have believed Christian did run when the shooting started, but it also could have found he still had the requisite intent for the underlying crime of robbery. Robbery requires the taking of personal property achieved by use of force or fear. That Christian may have run when Deon acted with deadly force does not automatically negate a finding that Christian willingly assisted Deon in employing the use of fear prior to the shooting.

¶50.    Christian's multiple statements as to whether he was standing nearby while Deon was talking to Carter, or sitting in a car, or standing in the woods presented conflicting stories.

19

This conflicting evidence was for the jury's consideration and determination on the question of Christian's intent. *Bond*, 162 So. 2d at 512.

¶51.   From this and other evidence in the case, rational minds reasonably could conclude that Christian willingly sanctioned the act of using fear to achieve the planned takings, the spoils of which–the evidence shows–Christian shared in after the killings.   The State's evidence sufficiently supports either above scenario, and rational minds could conclude under either, beyond a reasonable doubt, that Christian aided and abetted Deon in the commission of robbery, in which death resulted.

¶52.   Nor can it be said that the weight of the evidence in this case preponderates against the jury's verdict so as to sanction an unconscionable injustice.   Accordingly, Christian's weight-of-the-evidence claims and his insufficient-evidence claims are without merit.

### Felon in Possession of a Firearm

¶53.   Section 97-37-5(1) prohibits any person who previously has been convicted of a felony from possessing a firearm. That Christian was a convicted felon was stipulated at trial. The issue before the Court is whether sufficient evidence was presented that Christian possessed a firearm.

¶54.   Because the gun was not found on Christian's person, the State had to prove that Christian had constructive possession of the gun. *Williams v. State*, 971 So. 2d 581, 587 (Miss. 2007). "Constructive possession allows the prosecution to establish possession of contraband when evidence of actual possession is absent. Constructive possession is established by showing that the contraband was under the dominion and control of the

20

defendant." ***Roberson v. State***, 595 So. 2d 1310, 1319 (Miss. 1992) (citing ***Vickery v. State***, 535 So. 2d 1371, 1379 (Miss. 1988)). "[T]here must be sufficient facts to warrant a finding that the defendant was aware of the presence and character of the particular [contraband] and was intentionally and consciously in possession of it." ***Id***. Further, in ***Ginn v. State***, we stated:

> We have held that where contraband is found upon premises not in the exclusive control and possession of the accused, additional incriminating facts must connect the accused with the contraband. Where the premises upon which contraband is found is not in the exclusive possession of the accused, the accused is entitled to acquittal, absent some competent evidence connecting him with the contraband.

***Ginn v. State***, 860 So. 2d 675, 685 (Miss. 2003).

¶55.    The gun was found in a box atop a coat stand in Shannon's residence. Christian had been in Shannon's home following the murders, specifically, the day he was arrested. During a recorded jail telephone conversation, which was played to the jury, either Christian's mother or grandmother informed him that the police had recovered a gun from Shannon's house. Christian admitted in that conversation that the gun had been used to commit the murders, and that he was the last person to touch the gun, so his fingerprints would be on it.

¶56.    Considering the gun's location, along with Christian's statement to his grandmother or mother that his fingerprints were on the gun, any rational trier of fact could have found that Christian exercised dominion and control of the gun at some point just prior to when it was discovered. Accordingly, we find sufficient evidence was presented to support the jury's finding that Christian was in possession of the gun found in Shannon's home.

### Felonious Child Neglect

21

¶57. Christian also was convicted for felonious child neglect under then-Mississippi Code Section 97-5-39(1)(b),[4] which at the time of his indictment read in pertinent part:

> If the child's deprivation of necessary food, clothing, shelter, health care or supervision appropriate to the child's age results in substantial harm to the child's physical, mental or emotional health, the person may be sentenced to imprisonment in custody of the Department of Corrections for not more than five (5) years or to payment of a fine of not more than Five Thousand Dollars ($ 5,000.00), or both.

Section 97-5-39(1)(a) then stated that "any . . . person who willfully commits any acts or omits the performance of any duty, which act or omission contributes to or tends to contribute to the neglect . . . of any child . . . shall be guilty of a misdemeanor."[5]

¶58. We find sufficient evidence was presented from which the jury reasonably could find that Christian knew a baby was left in the home following the shootings and remained there for two days without necessary food or supervision.

¶59. First, Christian was found with Marks's cell phone on his person. From this evidence, the jury reasonably could infer that Christian had obtained this item from inside the home.

¶60. Second, the State also presented evidence that a large, flat-screen television set was taken from the home. Christian said in one of his statements that the television was "50 [or] 52" inches in size. Conflicting evidence was presented as to whether the size of the

---

[4] This section was amended in 2013, and now prescribes felonious child neglect in any case, whether bodily harm results or not, if the person intentionally, knowingly, or recklessly: "(i) Burn[s] any child; (ii) Physically tortures any child; (iii) Strangle[s], choke[s], smother[s] or in any way interfere[s] with any child's breathing; (iv) Poison[s] a child; (v) Starve[s] a child of nourishments needed to sustain life or growth; (vi) Use[s] any type of deadly weapon upon any child[.]" Miss. Code Ann. § 97-5-39(2)(a) (Rev. 2014).

[5] Under the current statute, a person who "intentionally, knowingly or recklessly" commits child neglect is guilty of a misdemeanor.

22

television necessitated at least two persons to carry it. In his third statement, Christian said that when he and Deon arrived back at Christian's aunt's house, Christian's uncle, Alonzo, came outside and helped Deon remove the television from the back of the truck. Christian's aunt testified that Deon brought the television inside her home by himself. But Alonzo testified that he helped Christian or Deon remove the television from the bed of the truck and carry it into Shannon's house. In addition to this testimony, photographs of the television, along with the actual television itself, were presented to the jury for its inspection. From this evidence, even though it was conflicting, it was not outside the realm of reason for the jury to find that Deon needed and had assistance from Christian in removing the television from the victims' home.

¶61. Also, Renata testified that the television had been set up in the bedroom where Renita's body was found. A layout drawing of the home was presented to the jury, showing the home's various rooms and how one would have to traverse through the house to get to any particular room. Thus, if the jury concluded that Christian was inside the home at some point, it also could reasonably infer that he knew there was a baby inside the home, particularly in light of where the baby was found by authorities.

¶62. In addition, the jury heard testimony from Ard, who said that when he was on the phone with Carter and overheard Carter and Deon arguing, he also heard a baby crying in the background. While Christian claimed in his statements he was never inside the home, he admitted to being in such proximity to Deon and Carter as to hear the crux of their argument. From this evidence, rational minds reasonably could infer that Christian also heard a baby

23

crying. Thus, even if the jury believed Christian was never in the home, it still could conclude that Christian knew a baby was in the home at the time of the shootings.

¶63. On the question of substantial harm, the only evidence presented was from Deputies Sanders and Smith. Both said the baby's diaper was soiled with feces. Deputy Smith testified that the baby was extremely hungry and appeared in "very bad shape." In Renata's testimony, she mentioned only that the baby now is three years old.

¶64. The statute does not define substantial harm, and this Court has not said what constitutes substantial harm. In 2007, the Legislature amended Section 97-5-39(1)(a)-(b) to provide that child deprivation now constitutes a felony if substantial harm resulted. *Lenard v. State*, 51 So. 3d 239 (Miss. Ct. App. 2011); *see* Miss. Code Ann. § 97-5-39(1)(a)-(b) (Rev. 2014). Prior to the 2007 amendment, Section 97-5-39(2) governed felonious child abuse, and required the conduct to cause serious bodily harm. It stated:

> Any person who shall intentionally (a) burn any child, (b) torture any child or, (c) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse and/or battery of a child and, upon conviction, may be punished by imprisonment in the penitentiary for not more than twenty (20) years.

¶65. In *Buffington v. State*, 824 So. 2d 576, 580 (Miss. 2002), this Court held that serious bodily harm means "bodily injury which creates a substantial risk of death, or permanent or temporary disfigurement, or impairment of any function of any bodily organ or function." Buffington adopted the definition announced in *Wolfe v. State*, 743 So. 2d 380, 385 (Miss. 1999), which was a plurality opinion. "Prior to *Wolfe*, only permanent disfigurement was found sufficient to prove felony child abuse." *Buffington*, 824 So. 2d at 580. *Buffington*

24

noted that the definition announced in Wolfe was the same definition provided for in Section 4f of the Model Child Protection Act of the National Center on Child Abuse and Neglect. *Id*. at 580.

¶66. The term "substantial harm" does not lend itself to easy definition. "Substantial" is defined as "consisting or relating of substance, considerable in quantity." *Substantial*, *Merriam Webster Dictionary*, http:// www.merriam-webster.com/dictionary/substantial (last visited November 9, 2016). "Harm" is defined as "physical, mental, or emotional damage, impairment, or deterioration." *Harm*, *Merriam Webster Dictionary*, http:// www.merriam-webster.com/dictionary/substantial (last visited November 9, 2016). Putting the plain meaning together, "substantial harm" means physical, mental, or emotional damage, impairment, or deterioration that is of substance or considerable in quantity.

¶67. Here, evidence was presented that the baby was left without food, water, or supervision for more than thirty-six hours. Deputy Smith testified that he was in a "very bad state" when they found him.

¶68. From the deputies' testimony at trial, we find sufficient evidence was presented for the jury to find that substantial harm resulted. Accordingly, this issue is without merit.

### 4. Whether the trial court erred in rejecting defendant's jury instruction D-3, abandonment of a criminal enterprise.

¶69. Christian contends that the trial court erred when it refused to give his jury instruction on abandonment, violating his fundamental right to a fair trial. The proposed instruction read:

> The Court instructs the jury that the abandonment of a criminal enterprise prior to the completion of the crime may, under certain circumstances, be a valid defense to a criminal charge. If a person becomes engaged in a criminal

25

enterprise and, before completion of that enterprise, that person completely renounces and abandons the criminal enterprise voluntarily and of his own free will without intervention from legal authorities, then that person shall not be held criminally liable for any actions thereafter by other unlawful actors.

If you believe that Travaris Christian, on January 24, 2011, unlawfully and feloniously embarked upon a criminal enterprise, that enterprise being the commission of house burglary, and if you believe that Travaris Christian renounced and abandoned that criminal enterprise prior to commission thereof by running away from the house, and if you believe that Travaris Christian abandoned that criminal enterprise voluntarily and of his own free will without the intervention of law enforcement, then you shall find Travaris Christian not guilty of house burglary as set forth in Count Three of the indictment.

¶70.  We find that the trial court properly denied Christian's proposed abandonment instruction. *People v. Nichols*, 230 N.Y. 221, 129 N.E. 883 (1921), is a persuasive case directly on point.

¶71.  In *Nichols*, the defendant claimed the trial court had erred by refusing to submit to the jury the question of whether the defendant had abandoned the criminal enterprise before the shot which killed the victim was fired by one of the coconspirators. *Id*. at 228. Finding no error, the New York Court of Appeals explained as follows:

Whatever may be the other requirements of an effective abandonment of a criminal enterprise it is certain both as a matter of law and of common sense that there must be some appreciable interval between the alleged abandonment and the act from responsibility for which escape is sought. It must be possible for a jury to say that the accused had wholly and effectively detached himself from the criminal enterprise before the act with which he is charged is in the process of consummation or has become so inevitable that it cannot reasonably be stayed. The process of detachment must be such as to show not only a determination upon the part of the accused to go no farther [sic] but also such as to give his co-conspirators a reasonable opportunity, if they desire, to follow his example and refrain from further action before the act in question is committed. A conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme which he has helped to devise and carry forward because as the result either of fear or even of a better motive he

26

concludes to run away at the very instant when the act in question is about to be committed and when the transaction which immediately begets it has actually been commenced, as in this case. While it may make no difference whether mere fear or actual repentance is the moving cause, one or the other must lead to an actual and effective retirement before the act in question has become so imminent that its avoidance is practically out of the question.

*Id*. at 229-30.

¶72. Here, no evidentiary basis existed to find Christian "voluntarily and of his own free will" abandoned the crime of "house burglary" prior to its commission. This Court has held that for an abandonment instruction to be warranted, the evidence must show that the defendant voluntarily abandoned his intent and did "not have his intent frustrated by the resistance of the victim . . . ." ***Pruit v. State***, 528 So. 2d 828, 831 (Miss. 1988). Further, as ***Nichols*** recognized, "a conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme which he has helped to devise and carry forward because as the result of fear or even of a better motive he concludes to run away . . . ." ***Nichols***, 230 N.Y. at 230.

¶73. Christian's alleged abandonment, under the most favorable aspect of the evidence, would not permit a jury to say that he had effected any such retirement from the criminal plan to which he was a party after the first shot was fired by Deon.

¶74. This issue is without merit.

### 5. Cumulative Error

¶75. Christian requests that this Court consider the prejudicial effect of cumulative errors which would warrant a new trial. Having found no error as to the issues raised, we find no cumulative errors that necessitate reversal.

27

# CONCLUSION

¶76.   The Hinds County Circuit Court's judgment of conviction is affirmed.

¶77.   **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITH ELIGIBILITY FOR PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT, WITH ELIGIBILITY FOR PAROLE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF HOUSE BURGLARY AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT IV: CONVICTION OF CONSPIRACY AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.  COUNT V: CONVICTION OF FELONY CHILD NEGLECT AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.  COUNT VI: CONVICTION OF FELON IN POSSESSION OF A FIREARM AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES IN ALL COUNTS ARE TO RUN CONCURRENTLY.**

**WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR AND COLEMAN, JJ., CONCUR. MAXWELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., RANDOLPH, P.J., LAMAR, COLEMAN AND BEAM, JJ.  KITCHENS, J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.**

**MAXWELL, JUSTICE, SPECIALLY CONCURRING:**

¶78.   The majority is correct that Dr. Barnhart did not violate Christian's Sixth Amendment right to confront his accuser.[6]   But I write separately to address Christian's very specific *Bullcoming*-based Confrontation Clause argument.  Christian clearly raised this precise argument.  And this is an issue the resolution of which is important to our circuit judges and criminal practitioners who face this claim frequently.

---

[6] U.S. Const. amend. VI.

¶79.    Relying on ***Bullcoming v. New Mexico***, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), Christian asserts that, because Dr. Barnhart did not personally conduct Carter's and Marks's autopsies, she cannot testify about their causes of death. This notion is incorrect and stretches ***Bullcoming***'s "limited reach" too far. ***Id.***, 564 U.S. at 668, 131 S. Ct. at 2719 (Sotomayor, J., concurring). ***Bullcoming*** does not restrict testimony by a pathologist who was personally involved in creating the autopsy report, albeit in a more limited fashion than performing the autopsy. Nor does it categorically prohibit an expert pathologist from giving her *independent* opinion about the cause of death because she did not perform the autopsy.

## I.    Sufficient Involvement with the Process

¶80.    Among the issues ***Bullcoming*** left unresolved was "the degree of proximity the testifying witness must have to the scientific test.'" ***Grim v. Fisher***, 816 F.3d 296, 309 (5th Cir. 2016) (quoting ***Flournoy v. Small***, 681 F.3d 1000 (9th Cir. 2012)); *see **Bullcoming***, 564 U.S. at 668, 131 S. Ct. at 2722 (Sotomayor, J., concurring) (noting "this is not a case in which the person testifying [was] a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue"). This is why our Court's pre-***Crawford***[7] and pre-***Bullcoming*** test for the sufficient degree of involvement to satisfy the Confrontation Clause is still good law. *See **Grim v. Fisher***, 816 F.3d at 310 (finding no federal-law violation of this Court's application of its degree-of-involvement test).

¶81.    In ***McGowen v. State***, we held that "when the testifying witness is a court-accepted expert in the relevant field who participated in the analysis *in some capacity*, such as by

---

[7] ***Crawford v. Washington***, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

29

performing procedural checks, then the testifying witness's testimony does not violate a defendant's Sixth Amendment rights." *McGowen v. State*, 859 So. 2d 320, 339 (Miss. 2003) (emphasis added). From this principle evolved a two-part test—"First, we ask whether the witness has 'intimate knowledge' of the particular report, even if the witness was not the primary analyst or did not perform the analysis firsthand. Second, we ask whether the witness was 'actively involved in the production' of the report at issue." *Grim v. State*, 102 So. 3d 1073, 1079 (Miss. 2012) (quoting *Conners v. State*, 92 So. 3d 676, 690 (Miss. 2012)).

¶82. We applied this test in *Grim* to hold that a laboratory supervisor—who was "not involved in the actual testing" of the substance seized from a defendant but "had reviewed the report for accuracy and signed the report as the 'case technical reviewer'"—was "sufficiently involved with the analysis and overall process" to testify the substance was cocaine without violating the Confrontation Clause. *Id.* at 1081.

¶83. After we affirmed his conviction, Grim filed for federal habeas corpus relief. A district judge in the Northern District of Mississippi granted Grim relief, holding that *Bullcoming* clearly establishes that, when a laboratory report is introduced into evidence, the defendant has a right to confront the analyst who performed the underlying analysis. *Grim v. Fisher*, 816 F.3d at 298 (discussing district court's decision in *Grim v. Epps*, 2015 WL 5883163 (N.D. Miss. Oct. 8, 2015)). Christian cites this district-court case as proof that this Court has been wrong in its analysis of *Bullcoming*.

¶84. But the Fifth Circuit recently said it was the district court that was wrong and reversed it. *Id.* at 299. In doing so, the Fifth Circuit held the exact opposite. It instead found that

30

*Bullcoming* "did *not* clearly establish the categorical rule . . . that when the prosecution introduces a forensic laboratory report containing a testimonial certification . . . the *only* witness whose in-court testimony can satisfy the Confrontation Clause is the analyst who performed the underlying analyses contained in the report." *Grim v. Fisher*, 816 F.3d at 307 (emphasis added). And in the absence of a clear rule, this Court's holding that the supervisor's testimony did not violate Grim's right to confrontation did not run afoul of federal law. *Id.* at 310.

¶85. So, contrary to Christian's argument, this Court's *Bullcoming* analysis has not been rejected. And this analysis leaves open the possibility that someone other than the pathologist that performed the underlying autopsy may testify about the autopsy report if he or she was sufficiently involved with the analysis and overall process.

¶86. But as Dr. Shaker's autopsy report was not introduced into evidence here, I agree with the majority that the particular sufficient-involvement analysis we performed in *Grim* is not necessary.

## II. Independent Expert Testimony

¶87. Despite Dr. Shaker's report and notes *not* being introduced into evidence, Christian still insists that Dr. Barnhart's testimony violated *Bullcoming*. According to Christian, Dr. Barnhart could not testify about the causes of death because she did not perform the autopsies herself.

¶88. But *Bullcoming* was "not a case in which an expert witness was asked for his *independent* opinion about underlying testimonial reports that were not themselves admitted

into evidence." ***Id.***, 564 U.S. at 673, 131 S. Ct. at 2722 (Sotomayor, J., concurring) (emphasis added). Instead, ***Bullcoming*** specifically concerned "surrogate testimony"—i.e., the prosecution's introduction of a forensic report containing a testimonial certification through the in-court testimony of a forensic analyst "who did not sign the certification or perform or observe the test reported in the certification." ***Id.***, 564 U.S. at 651, 131 S. Ct. at 2710. In his separate opinion, Justice Kitchens assumes Dr. Barnhart was called to be a surrogate witness. But Dr. Barnhart was no surrogate. She was called as an expert witness to give her *independent* opinion about the cause of Carter's and Marks's deaths. *See* ***Commonwealth v. Brown***, 139 A.3d 208, 217-19 (Pa. Super. Ct. 2016) (holding medical examiner's *independent* conclusions regarding the cause of death were admissible); *see also* ***State v. Gonzalez***, 274 P.3d 151, 158-59 (N.M. Ct. App. 2012) (finding no per se Confrontation Clause violation by allowing one expert pathologist to testify based on information gathered in an autopsy performed by another pathologist). Thus, it is obvious ***Bullcoming***'s surrogate-testimony prohibition was not violated here, since Dr. Barnhart did not testify from the autopsy report but instead gave her independent expert opinion about the cause of death.

**WALLER, C.J., RANDOLPH, P.J., LAMAR, COLEMAN AND BEAM, JJ., JOIN THIS OPINION.**

**KITCHENS, JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶89. I write separately because Travaris Christian was not afforded the opportunity to cross examine Dr. Adel Shaker, the forensic pathologist who conducted the autopsies of the homicide victims. Instead, the findings of Dr. Shaker, in the form of notes and photographs,

32

were brought to the attention of the jury through the testimony of a surrogate witness, Dr. Erin Barnhart, in violation of the Confrontation Clause. Nevertheless, because the extent of Dr. Barnhart's testimony was that the victims had succumbed to gunshot wounds, I would conclude that the Confrontation Clause violation constituted harmless error.

¶90. In all criminal proceedings, the accused enjoys the right to confront his or her accuser. U.S. Const. amend. VI, Miss. Const. art. 3, § 26. The United States Supreme Court has held that the Confrontation Clause disallows "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). In 2009, the Court held that "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine" constituted testimonial statements and that their admission violated the Confrontation Clause "[a]bsent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them . . . ." *Melendez-Diaz v. Mass.*, 557 U.S. 305, 307, 310-11, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) (emphasis in original). In 2011, the Court held that the Confrontation Clause is violated when a surrogate analyst witness, having neither participated in nor observed the testing itself,  testifies regarding the results of a forensic laboratory report certifying the defendant's blood-alcohol content. *Bullcoming v. N.M.*, 564 U.S. 647, 652, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011).

¶91.    A plurality of the Supreme Court considered whether a surrogate expert witness could, consistent with *Crawford* and its progeny, testify "that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of petitioner's blood." *Williams v. Ill.*, 132 S. Ct. 2221, 2227, 183 L. Ed. 2d 89 (2012). The testimony substantiated that the DNA from the defendant matched semen collected from vaginal swabs. *Id.* at 2237.

¶92.    A plurality[8] of the Court distinguished the case from *Bullcoming* and *Melendez-Diaz* by pointing out that, in those cases, forensic reports were admitted into evidence "for the purpose of proving the truth of what they asserted: in *Bullcoming* that the defendant's blood alcohol level exceeded the legal limit and in *Melendez-Diaz* that the substance in question contained cocaine." *Id.* at 2240. In *Williams*, the plurality found, the expert witness testified only that the DNA profile report produced by the laboratory matched the defendant's DNA. *Id.* The expert witness did not, according to the plurality, testify to the truth of the matter asserted, that the DNA profile report from the vaginal swab accurately represented the defendant's DNA. *Id.* The plurality found further that the report was not prepared for an accusatory purpose, but rather to capture a rapist who remained at large. *Id.*

¶93.    The dissent argued that the Confrontation Clause plainly was violated when an expert witness testified regarding the contents of the DNA profile report which identified the defendant, in the absence of his having been given the opportunity to cross examine the

---

[8] Justice Alito authored an opinion, joined by Chief Justice Roberts and Justice Kennedy. Justice Breyer concurred in full with separate written opinion. Justice Thomas concurred only in the judgment and filed a separate written opinion. Justice Kagan dissented, joined by Justice Scalia, Justice Ginsburg, and Justice Sotomayor.

34

report's preparer: "[t]he report at issue here shows a DNA profile produced by an analyst at Cellmark's laboratory allegedly from a vaginal swab taken from a young woman, L.J., after she was raped. That report is identical to the one in *Bullcoming* (and *Melendez-Diaz*) . . . ." *Williams*, 132 S. Ct. at 2266 (Kagan, J., dissenting). The report, according to the dissent, was created for the purpose of establishing the identity of the perpetrator and, therefore, "the substance of the report could come into evidence only if Williams had a chance to cross-examine the responsible analyst." *Id.* at 2267. The dissent posed the question "[h]ave we not already decided this case?" and noted that it had "[b]een there, done that" in *Melendez-Diaz* and *Bullcoming*. *Id.* at 2267, 2275.

¶94. This Court has struggled with the application of the Confrontation Clause in the context of admission of forensic evidence in the absence of testimony of the testing forensic analyst. *See Conners v. State*, 92 So. 3d 676 (Miss. 2012) (admission of a firearm identification report and a toxicology report violated the Confrontation Clause but was deemed harmless error because the firearm identification report did not establish conclusively that the spent shell casings came from the shotgun found at the scene and the toxicology report supported the defendant's theory of defense); *Jenkins v. State*, 102 So. 3d 1063 (Miss. 2014) (Confrontation Clause not violated where witness testified that the substance found in the possession of the defendant was cocaine. Although the witness was a mere technical reviewer who did not test the substance but rather reviewed a report prepared by the primary analyst who actually had conducted the testing, the technical reviewer was actively involved in the production of the report and had intimate knowledge of the analyses); *Grim v. State*,

35

102 So. 3d 1073 (Miss. 2014) (same); *Hingle v. State*, 153 So. 3d 659 (Miss. 2014) (Confrontation Clause not violated where technical reviewer, who reviewed the report of the primary analyst but did not test the substance, testified that pills in the possession of the defendant contained morphine).

¶95. Three of my colleagues and I declined to join this Court's decisions in *Jenkins*, *Grim*, and *Hingle*, holding that "the admission of [the analyst's] laboratory report via [the technical reviewer's] testimony, without the defendant's having had a prior opportunity to cross-examine [the analyst], violated [the defendant's] constitutional right to confrontation, thereby impairing his right to a fair trial." *Grim*, 102 So. 3d at 1082 (Kitchens, J., dissenting). We agreed that the technical reviewer "could not testify as to whether [the analyst] had received the sample intact, whether [the analyst] had dropped or mishandled the sample, or whether [the analyst] had encountered any problems with the testing equipment" and that the technical reviewer's "surrogate testimony could not 'expose any lapses or lies on the analyst's part.'" *Hingle*, 153 So. 3d at 669 (Chandler, J., dissenting) (citing *Bullcoming*, 131 S. Ct. at 2715).[9]

¶96. Never before has this Court or the United States Supreme Court considered whether a forensic pathologist who did not conduct an autopsy could, consistent with the Confrontation Clause, *Crawford*, *Melendez-Diaz*, and *Bullcoming*, testify as a surrogate witness about the autopsy's results. Justice Kennedy pointed out in his dissent in *Melendez-Diaz* that "every court post-*Crawford* has held that autopsy reports are not testimonial."

---

[9] Recently, I reiterated "that *Jenkins*, *Grim*, and *Hingle* 'are inconsistent with the strictures of *Bullcoming*' and 'I would overrule those cases.'" *Armstead v. State*, 196 So. 3d 913, 926 (Miss. 2016) (Kitchens, J., dissenting) (quoting *Hingle*, 153 So. 3d at 670 (Chandler, J., dissenting)).

*Melendez-Diaz*, 557 U.S. at 335 (Kennedy, J., dissenting) (citing Carolyn Zabrycki, *Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement,* 96 Cal. L. Rev. 1093, 1094 (2008)).

¶97.    More recently, another commentator has opined that forensic autopsy reports themselves constitute testimonial statements because they "formally describe autopsy findings and report the cause and manner of death" and that "[f]orensic pathologists are quite aware that their autopsy reports will be evidentiary and that the testimony of a forensic pathologist will be sought at trial." Marc D. Ginsberg, *The Confrontation Clause and Forensic Autopsy Reports—A "Testimonial,"* 74 La. Law Rev. 117, 171 (2013). As such, "the accused must be entitled to confront and cross-examine the examining forensic pathologist to test the validity of the autopsy and the pathologist's observations, conclusions, and opinions." *Id.*

¶98.    A split of federal and state authority exists on the question of whether autopsy reports and/or surrogate testimony about the autopsy results are testimonial for purposes of a Confrontation Clause analysis. Various federal courts articulate a variety of reasons why autopsy reports are not testimonial and, as such, do not implicate the Confrontation Clause at all. *See U.S. v. De La Cruz*, 514 F.3d 121 (1st Cir. 2008) (an autopsy report is a business record kept in the course of regularly conducted business activity and is expressly excluded from the scope of *Crawford*); *Nardi v. Pepe*, 662 F.3d 107 (1st Cir. 2011) (an autopsy report is distinguishable from the sworn documents at issue in *Melendez-Diaz* and *Bullcoming*); *Hensley v. Roden*, 755 F.3d 724, 735 (1st Cir. 2014) (no Confrontation Clause violation

where surrogate medical examiner testified about the autopsy report prepared by another because, at the time the decision was made to allow the testimony "it was not settled that autopsy reports fell within the core class of testimonial documents enumerated in *Crawford*"); *U.S. v. Feliz*, 467 F.3d 227 (2d Cir. 2006) (an autopsy report is not testimonial because it is a business record); *U.S. v. James*, 712 F.3d 79 (2d Cir. 2013) (an autopsy report is not testimonial because it is not created to establish a fact at trial); *Mitchell v. Kelly*, 520 F. App'x 329 (6th Cir. 2013) (per curiam) (given the lack of guidance from the Supreme Court, autopsy reports are admissible as nontestimonial business records and no Confrontation Clause violation occurs where a surrogate witness testifies regarding its contents); *McNeiece v. Lattimore*, 501 F. App'x 634, 636 (9th Cir. 2012) (testimony from surrogate witness about the autopsy results "was not contrary to or an unreasonable application of clearly established federal law" and the autopsy report was a nontestimonial business record); *U.S. v. MacKay*, 715 F.3d 807 (10th Cir. 2013) (defendant had an opportunity to object to the autopsy report's admission on the basis of *Bullcoming* but failed to do so).

¶99.    Other federal courts deem autopsy reports to be testimonial or assume that they are testimonial. *See Martinez v. Davis*, 2016 WL 3509589 (5th Cir. June 24, 2016) (any Confrontation Clause error in admitting autopsy reports and testimony of surrogate pathologist was harmless because other evidence linked defendant to the crime); *U.S. v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012) (an autopsy report is testimonial because it is prepared for use at trial; the surrogate medical examiner witness's testimony about contents

38

of the autopsy reports violated the Confrontation Clause because the surrogate "had neither performed nor been present during the autopsies in question" and therefore "was not in a position to testify on cross-examination as to the facts surrounding how the autopsies were actually conducted or whether any errors, omissions, or mistakes were made"); *U.S. v. Moore*, 651 F. 3d 30, 74 (D.C. Cir. 2011) ("Assuming error with respect to admission of the autopsy reports, and thus not reaching the question left open in *Bullcoming*, . . . we hold the error was harmless beyond a reasonable doubt" because evidence presented substantiated that the murders in question were accomplished by gunshots); *U.S. v. Bostick*, 791 F.3d 127 (D.C. Cir. 2015) (no plain error in admitting the autopsy reports because they "did not play an important role in the trial" because there was no dispute that gunshots killed the victims), *petition for cert. filed, Edelin v. U.S.* (U.S. July 7, 2016) (No. 05-3010).

¶100. States, likewise, disagree with regard to testimony of surrogate witnesses about the autopsy results and admissibility of autopsy reports, themselves. Many states hold that autopsy reports are nontestimonial and that a surrogate pathologist may, consistent with the Confrontation Clause, express independent conclusions about the autopsy. *See State v. Medina*, 306 P.3d 48 (Ariz. 2013) (autopsy report is not testimonial because its primary purpose is not to identify a particular suspect; surrogate witness's testimony concerning that witness's independent conclusions about the autopsy does not violate the Confrontation Clause); *People v. Leon*, 352 P. 3d 289 (Cal. 2015) (the conclusions of the surrogate witness were recited from the autopsy report of a deceased forensic pathologist, which was admitted; assuming those were admitted erroneously, they were harmless beyond a reasonable doubt

because the cause of death, shooting, was undisputed); *People v. Dungo*, 286 P.3d 442 (Cal. 2012) (no Confrontation Clause violation where surrogate pathologist expressed his own opinions based on a nontestifying forensic pathologist's autopsy report); *People v. Leach*, 980 N.E.2d 570 (Ill. 2012) (autopsy report qualifies as a business record and is nontestimonial because it is not prepared for the primary purpose of providing evidence against the accused; surrogate pathologist's testimony about autopsy report did not violate the Confrontation Clause); *State v. Maxwell*, 9 N.E. 3d 930 (Ohio 2014) (autopsy reports are created for the primary purpose of documenting cause of death for public records and surrogate pathologist's testimony about the autopsy report did not violate the Confrontation Clause because he provided independent conclusions about cause and manner of death); *State v. Craig*, 853 N.E.2d 621 (Ohio 2006) (an autopsy report admissible as a nontestimonial business record; surrogate pathologist's testimony about the autopsy findings did not violate the Confrontation Clause); *State v. Cutro*, 618 S.E.2d 890 (S.C. 2005) (an autopsy report is a public record and, therefore, is not testimonial; surrogate pathologist's testimony satisfied the right of the accused to confront the pathologist); *State v. Hutchison*, 482 S.W.3d 893 (Tenn. 2015) (an autopsy report is admissible as a business record; testimony of surrogate pathologist, therefore, did not violate the Confrontation Clause).

¶101.  Other states take different approaches. *See Commonwealth v. Reavis*, 992 N.E.2d 304 (Mass. 2013) (surrogate medical examiner may not testify about an autopsy report that is not admitted, but such testimony amounted to harmless error because the testimony was cumulative of properly admitted evidence); *Commonwealth v. Avila*, 912 N.E.2d 1014

(Mass. 2009) (surrogate medical examiner's testimony about findings in the autopsy report prepared by another medical examiner constituted testimonial hearsay and their admission violated the Confrontation Clause; but any error was harmless because other evidence supported the Commonwealth's theory); ***State v. Sisneros***, 314 P.3d 665 (N.M. 2013) (surrogate pathologist who was not present at autopsy testified about the cause and manner of death based on her review of the autopsy, though the autopsy report was not admitted into evidence; because the surrogate pathologist was allowed "to parrot" the subjective statements of the pathologist who conducted the autopsy, the Confrontation Clause was violated, but the error was deemed harmless because the cause and manner of death, multiple gunshot wounds, was not disputed); ***State v. Navarette***, 294 P.3d 435 (N.M. 2013) (autopsy reports "regarding individuals who suffered a violent death are testimonial" and their admission through a surrogate pathologist witness who testified about the subjective findings and conclusions of the pathologist who conducted the autopsy violated the Confrontation Clause and constituted reversible error); ***State v. Locklear***, 681 S.E.2d 293 (N.C. 2009) (admission of testimony of a surrogate medical examiner about the contents of an autopsy report and a forensic dental analysis violated the Confrontation Clause but was harmless error because the testimony, which identified the victim's body and cause of death, was not critical to the prosecution); ***State v. Flack***, 753 S.E.2d 761 (2013) (reiterated prior holdings that Confrontation Clause is violated when a surrogate medical examiner who did not conduct the autopsy testified about the contents of an autopsy report prepared by another pathologist;

but because the testimony established merely that the cause of death was a gunshot wound and that the manner of death was homicide, the error was harmless).

¶102. In the present case, the testifying forensic pathologist, Dr. Erin Barnhart of the Mississippi State Medical Examiner's Office, stated that she did not conduct autopsy procedures on the bodies of Robert Carter and Renita Marks. Dr. Adel Shaker, who was at the time of Christian's trial no longer with the Mississippi State Medical Examiner's Office, conducted the autopsies. According to Dr. Barnhart, "during the course of the autopsy the forensic pathologist will make some rough handwritten notes; some pathologists may dictate during the course of their autopsy, and a number of photographs are taken during the autopsy in order to document whatever during the procedure." While Dr. Shaker did not write formal autopsy reports, Dr. Barnhart "reviewed the autopsy notes and the autopsy photographs" and made notes herself.

¶103. Based on the available materials, Dr. Barnhart concluded that "Mr. Carter sustained three gunshot wounds, two to his chest area and one to the lower abdomen area" and that "both gunshot wounds to the chest resulted in injury to the heart, and the gunshot wound to the abdomen resulted in soft tissue abrasion." According to Dr. Barnhart, Renita Marks "suffered six gunshot wounds, five perforating . . . , and one penetrating."[10] Gunshot wounds "of her chest area and abdominal area" caused Marks's death. With regard to both Carter and Marks, Dr. Barnhart testified that "the manner of death is homicide."

---

[10] Dr. Barnhart explained that "perforating" means "there's both an entry and exit component meaning that there's no projectile left in the body."

¶104. The majority cites ***Bufford v. State***, in which the Mississippi Court of Appeals quoted the rule from this Court that "'a supervisor, reviewer, or other analyst involved may testify in place of the primary analyst where that person was "actively involved in the production of the report and had intimate knowledge of analyses even though he or she did not perform the tests firsthand."'" ***Bufford v. State***, 191 So. 3d 755, 763 (Miss. Ct. App. 2015) (quoting ***Grim***, 102 So. 3d at 1081) (quoting ***McGowen v. State***, 859 So. 2d 320, 340 (Miss. 2003)). The Court of Appeals was considering a case similar to this. Dr. Shaker had performed the victim's autopsy, but Dr. Barnhart, as here, reviewed Dr. Shaker's notes and photographs and "compiled an autopsy report from which she testified at trial." ***Bufford***, 191 So. 3d at 763. The Court held that no Confrontation Clause violation had occurred by such testimony from Dr. Barnhart because she "actively participated in the analysis, forming her own report based on Dr. Shaker's case notes and photographs as well as her education and experience." ***Id.*** I voted to grant Bufford's petition for writ of *certiorari*, which was denied on May 19, 2016.

¶105. I am persuaded by the reasoning of those federal and state courts which have held that an autopsy report, whether itself admitted in evidence, testimonially related by a forensic pathologist or both, is testimonial. This Court has defined "testimonial statements" to be those "reasonably expected to be used 'prosecutorially,' such as confessions, affidavits, custodial police examinations, and depositions.'" ***Armstead***, 196 So. 3d at 917 (quoting ***Rubenstein v. State***, 941 So. 2d 735, 754 (Miss. 2006)). Irrespective of whether the results of an autopsy identify a particular defendant, which some courts deem relevant, an autopsy report in a homicide case reasonably is expected to be used prosecutorially. One

commentator has observed that "[f]orensic pathologists are quite aware that their autopsy reports will be evidentiary and that the testimony of a forensic pathologist will be sought at trial." Ginsberg, *supra* ¶ 98 at 171. The adjective *forensic* signals that the work product of the pathologist is destined for judicial proceedings.

¶106.  Here, the State has adduced testimony from Dr. Barnhart about the autopsy findings of Dr. Shaker. A law enforcement investigator was present at the autopsies conducted by Dr. Shaker. Investigator Greg Lewis with the Hinds County Sheriff's Office testified that he "made it a practice to . . . try to attend most of the autopsies of the cases that I work for various reasons to where I could take photographs at the autopsy if I needed to . . . ." Investigator Lewis testified that, in this case, he "took photographs along with the medical examiner's office . . . ." He authenticated two such photographs he had taken during the autopsies. The results of the autopsies, about which Dr. Barnhart testified, were testimonial in nature, and the Confrontation Clause applies.

¶107.  I would hold also that the Confrontation Clause requires the forensic pathologist who conducted the autopsy to testify regarding his or her conclusions. A surrogate forensic pathologist cannot, consistent with the Constitution, testify about the expert conclusions of the forensic pathologist who conducted the autopsy. In this context, a surrogate forensic pathologist who was not present at the autopsy cannot be cross examined in an adequate and meaningful way with regard to the findings of the forensic pathologist who conducted the autopsy. As I would have held in **Hingle** with regard to the testimony of the technical reviewer, here "surrogate testimony could not 'expose any lapses or lies on the [conducting

44

pathologist's] part.'" ***Hingle***, 153 So. 3d at 669 (Chandler, J., dissenting) (citing ***Bullcoming***, 131 S. Ct. at 2715). One commentator has observed that:

> The only vehicle by which a criminal defendant may explore the subjectivity involved in the performance of the forensic autopsy—to question the judgment of the examining forensic pathologist—is cross-examination. The in-court testimony of the surrogate forensic pathologist who examines the autopsy report prepared by the examining pathologist is an inadequate substitute. The surrogate witness is not the physician who was required to be familiar with the facts and the autopsy protocol, examine the victim's body, perform the autopsy procedure, make and report findings, and report the cause and manner of death. The cross-examination of the surrogate yields very little. The surrogate can rely on the autopsy findings with impunity. There is simply little to be gained by the defendant in the effort to cross-examine the surrogate. Cross-examination is the great truth-seeking test, but it is an empty exercise when the surrogate testifies at trial.

Ginsburg, *supra* ¶ 98 at 170.

¶108. Of course, any interpretation of the federal Constitution is subject to change by the United States Supreme Court, which has not decided whether the admission of autopsy reports or the testimony of surrogate forensic pathologists violates the Confrontation Clause. However, this Court, based on our state's constitution, can afford greater constitutional protections by setting a higher standard than the federal floor. ***Downey v. State***, 144 So. 3d 146, 151 (Miss. 2014) ("We are empowered by our state constitution to exceed federal minimum standards of constitutionality . . . .") Here, Christian has raised both the Sixth Amendment Confrontation Clause and its Mississippi counterpart, Article 3, Section 26, of the Mississippi Constitution. Irrespective of future federal jurisprudence on the topic, I would hold that the Confrontation Clause of Article 3, Section 26, of the Mississippi Constitution

requires that the forensic pathologist who conducted and/or observed an autopsy testify about the results, reports, photographs, or notes derived therefrom.

¶109. Dr. Barnhart reviewed Dr. Shaker's notes and photographs and made notes herself. But I cannot agree that the Confrontation Clause has been satisfied by her testimony. I would, however, find that, because Dr. Barnhart's testimony established only that the deaths were caused by gunshot wounds, an undisputed fact, its admission in this case was harmless beyond a reasonable doubt. Accordingly, I concur in part and in result.

**KING, J., JOINS THIS OPINION.**