# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-KA-01021-COA

**DEMARCO KELLY**                                                                 **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                            **APPELLEE**

DATE OF JUDGMENT:              05/31/2019
TRIAL JUDGE:                  HON. PAUL S. FUNDERBURK
COURT FROM WHICH APPEALED:    ITAWAMBA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                              BY: ERIN ELIZABETH BRIGGS
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                              BY: MATTHEW WYATT WALTON
NATURE OF THE CASE:           CRIMINAL - FELONY
DISPOSITION:                  AFFIRMED - 11/10/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.    An Itawamba County Circuit Court jury found Demarco Kelly guilty of capital murder for the killing of Andre Taylor during an attempted burglary.  The circuit court sentenced Kelly to life imprisonment without eligibility for parole in the custody of the Mississippi Department of Corrections.  Kelly appeals his conviction and sentence, arguing that the circuit court erroneously refused his proposed jury instructions regarding his alleged abandonment of the attempted burglary and regarding culpable-negligence manslaughter. After reviewing the record, the arguments of counsel, and the relevant law, we hold that the circuit court did not err in refusing Kelly's proposed instructions, and we affirm Kelly's

conviction and sentence.

**Facts**

¶2. Andre Taylor and a family friend Debrico Burgess lived at 410 Museum Street in Mantachie, Itawamba County, Mississippi, not far from a factory where Taylor worked. By July 2015 they had been living there about a month, and Taylor's brother, Jasper Woods, was in the process of moving in with them. Woods and Burgess had recently befriended Tonisha Johnson and Kyra McClenton, whom they met through Burgess's girlfriend, Brittany Durham. Tonisha and Kyra, who lived in an apartment in Tupelo, visited the men at the Museum Street home with Brittany on several occasions.

¶3. Early in July 2015 during one of these visits, Brittany and Kyra noticed a large amount of marijuana and money present. When the women returned to Tonisha's apartment, Brittany commented on how easy it would be to rob the men's home. Tonisha and Kyra thought more seriously about Brittany's observation. They planned to rob Taylor and Burgess with the help of others. Tonisha's brother, Tyjuan Metcalf, needed the money and readily agreed with their idea. He enlisted Demarco Kelly and Tyandre Thomas to help.

¶4. On July 12, 2015, Tonisha and Kyra drove to Clarksdale to pick up the men for the robbery that was planned for that evening. All three men had guns. Kelly had borrowed either a 9 millimeter or a .40-caliber pistol (he could not recall). Metcalf had a revolver and a .38-caliber pistol, and Thomas had a .45-caliber pistol. The initial plan was that Metcalf and the others would rob the Museum Street house that night while Tonisha and Kyra were visiting there so that no one would suspect that the women were involved. Tonisha would

2

make sure the door was unlocked.[1] The group stopped by a Walmart to purchase zip ties that would be used to tie everyone up. On their way to Tonisha's apartment, they drove by the Museum Street house in Mantachie so Metcalf and the others would know where to go.

¶5. But the plan changed when Woods later texted Tonisha and said that he and Burgess were on their way to Tonisha's apartment for the evening instead. The group decided that while Tonisha and Kyra entertained Woods and Burgess, Metcalf, Kelly, and Thomas would go and rob the Museum Street house. At trial, Tonisha testified that Woods told her no one was at home; however, in the statement she gave when she was arrested, she said there might have been two people there but that Metcalf, Kelly, and Thomas would have been able to handle them.[2] Tonisha said that if the door were locked, the men would retreat, and the group would implement the original plan the next day when the girls were scheduled to go over to the Museum Street house for a planned get-together. Near midnight, shortly before Woods and Burgess arrived, Metcalf, Kelly, and Thomas left in Tonisha's SUV.

¶6. Metcalf, Kelly, and Thomas proceeded to the Museum Street house. They observed someone pulling up in a car and entering the home. This someone was Brandon Woods, another one of Taylor's brothers. So as the three would-be robbers approached the front door, Taylor and Brandon Woods were inside. Metcalf tried to turn the knob and jiggled it, but the door was locked. Instead of leaving as previously agreed, Metcalf tried to kick the

---

[1] Tonisha testified that the door was normally left unlocked and that they wanted the door to be unlocked so they could not be accused of breaking and entering.

[2] Tonisha was originally charged with capital murder but pled guilty to armed robbery in exchange for her testimony against Kelly. She currently has a forty-year sentence, with twenty years suspended and twenty years to serve.

door in.  When Metcalf did not succeed, Kelly tried to kick it in as well.  When a voice from inside asked who was there, they stopped, scattered, and ran.

¶7.     When Taylor opened the door, no one was there.  Brandon said they both stepped outside, looking for who had kicked the door.  Taylor was in the lead, and according to Brandon, Taylor walked to the edge of the porch slab.  Suddenly, a shot rang out, and Taylor was hit.  Brandon got his brother inside and called 911.  Law enforcement and paramedics arrived, and Taylor died on the way to the hospital.[3]

¶8.     In a statement he later gave to the police, Kelly said that when they heard the voice from inside the house, Thomas "took off running."  Kelly followed Thomas, and Metcalf was behind them both.  Kelly said he knew someone had come outside because he could hear voices talking.  As Kelly was running, he said that he shot one time toward the back of the house.[4]  Then, Kelly said he heard two other shots.  Metcalf was nearer to the front of the house when Kelly heard these other shots.  Kelly said Metcalf never came in the backyard.

¶9.     The three met at Tonisha's SUV and headed to a warehouse in Tupelo where Metcalf worked.  While there, Kelly called a friend in Clarksdale named Raveen Flowers.  In his statement, Kelly said she overhead Metcalf admit to shooting Taylor.[5]  While the men were at the warehouse, Tonisha texted them and told them that Woods and Burgess had received

---

[3] Police took Brandon Woods to jail, where he was tested for gunshot residue.  The results were negative.

[4] Investigator Michael Newlin testified that he examined an electrical pole in the area for evidence of a gunshot hole and found none.

[5] Kelly did not call Flowers as a witness at his trial.

a call about the shooting and that she and Kyra were going with them back to the Museum Street house.

¶10. When they arrived, Woods and Burgess stayed in the car while Tonisha and Kyra talked to the police. They confirmed that Taylor had been shot and taken to the hospital. Before going there, Woods and Burgess said they would drop off Tonisha and Kyra at their apartment. Kyra texted Metcalf and told them they were on their way home and that Metcalf and the others should get the weed Wood and Burgess had brought with them. According to Kyra, Metcalf came up with the idea of staging a robbery of the apartment before Tonisha and Kyra returned. Metcalf figured that Woods and Burgess, who had personal issues with the police, would not want to stay around when they brought Tonisha and Kyra home.

¶11. Kelly, Metcalf, and Thomas went to Tonisha's apartment and ransacked it, turning over furniture and other items. They took the marijuana that Woods and Burgess had brought to the apartment that evening, along with a television. When Tonisha and Kyra arrived home, they reported the fake robbery to the police. Woods received a call that his brother had died. He and Burgess then left to go to the hospital to meet with Woods's mother and view Taylor's body.

¶12. After the police left Tonisha's apartment, Kelly, Metcalf, and Thomas returned. Tonisha and Kyra drove the men back to Clarksdale. During the trip, the men were talking about what had happened and who shot Taylor. In the statement Kelly gave to law enforcement, Kelly claims that Metcalf said, "I shot him—it's his fault he come out there. He's dead now and there is nothing we can do about it." But Tonisha and Kyra testified that

5

it was Kelly who said he shot Taylor.[6]

¶13.   The Mantachie police responded to the shooting incident, and eventually the Mississippi Bureau of Investigation and the Itawamba County Sheriff's Department took over the investigation.   A criminal investigator from the sheriff's department, Michael Newlin, obtained information that led to Kelly's arrest.   Newlin was present on July 15, 2015, when Kelly was informed of his *Miranda*[7] rights and questioned by MBI investigator Agent Chad Cummings.   Over a period of four hours, Kelly gave three different written statements.   In his first statement given at 2:07 p.m., Kelly denied any involvement in the crime, saying he was with his girlfriend, Raveen Flowers, from the afternoon of July 12 until 3 a.m. the next morning.   In his second single-page statement given at 2:45 p.m., Kelly admitted that there was a plan to "to tie them [(Taylor and Woods)] up" and rob them but the door was locked, and they tried to kick it.   Then Kelly ran and heard gunshots.   He went on to tell how they staged the robbery at Tonisha's apartment and how Tonisha took them back to Clarksdale.   Cummings and Newlin continued to question Kelly until, at 4 p.m., Kelly gave a third five-page statement detailing the robbery and shooting.   In this statement, Kelly admitted that as he ran from the house, he fired one shot behind him.

¶14.   On July 17, 2015, after Kelly's initial court appearance on July 16, 2015, Kelly asked to talk to Newlin.   Newlin, who was off-duty when he received the call, returned to the sheriff's office at 11:30 p.m. to speak to Kelly.   This time, Kelly's statement was videotaped

---

[6] Kyra also pled guilty to armed robbery and received a fifteen-year sentence in exchange for her testimony against Kelly.

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

6

after he was informed of his *Miranda* rights again.[8]  In this conversation, Kelly told Newlin about his witness, Raveen Flowers.  Kelly admitted that he shot at the back of the house but that Metcalf was at the front and shot twice after he did.  Kelly gave Newlin the name of the person from whom he had borrowed the gun and offered to have his mother get it and bring it to Newlin.

¶15.    An Itawamba County grand jury indicted Kyra, Tonisha, Kelly, Metcalf, and Thomas for Taylor's murder, charging that they did "willfully, unlawfully and feloniously with or without malice aforethought or deliberate design, kill and murder Andre Stephon Taylor Jr." while they "were engaged in the commission of attempted burglary of a dwelling with intent to commit a crime therein to wit: robbery, in violation of Mississippi Code Annotated, section 97-17-23, all in violation of Mississippi Code Annotated section 97-3-19(2)(e)."

¶16.    The circuit court severed the cases, and Kelly's case proceeded to trial on May 28, 2019.    Testifying witnesses included Tonisha Johnson, Kyra McClenton, Investigator Michael Newlin,  Brandon Woods, Jasper Woods, and witnesses who verified a video of Tonisha's car taken on the night of the robbery and shooting near the crime scene.[9]    Dr. Mark LeVaughn testified to Taylor's cause of death—"bleeding to death from a gunshot wound"—and manner of death—"homicide."  In addition to pictures of the crime scene, the

---

[8] The first two statements were not videotaped because they were given at the county jail, which did not have videotaping capability.  The July 17, 2015 statement was taken at the sheriff's office where videotaping equipment was available.

[9] Tyjuan Metcalf, who pled guilty to second-degree murder, also took the stand.  At first, he "plead the Fifth" and then "could not remember" the events of that night.  He said he feared reprisals from other inmates against him or his family, should it become known that he had testified against Kelly.

State introduced a photograph of the metal front door at the Museum Street house, showing a dent where it had arguably been kicked. Also admitted were photos of Tonisha's SUV, photos of the deceased, a photo of the projectile (bullet) retrieved from the deceased, the autopsy of the deceased, Kelly's statements, several ziplock bags of marijuana collected at the scene, and videotaped footage of Tonisha's SUV that Metcalf, Kelly, and Thomas were riding in taken by a security camera at a local gas company near the place and at the time of the shooting. The gun Kelly had was never retrieved, so there was no ballistics testing to determine if the fatal bullet had come from Kelly's gun.

¶17. The State rested, and the circuit court denied Kelly's motion for directed verdict. Thereafter, Kelly declined to testify and presented no witnesses or evidence in his defense.

¶18. At the close of testimony, Kelly proposed a number of instructions, several of which the circuit court refused, including ones about Kelly's defense that he had abandoned the attempted burglary and one on culpable manslaughter. After closing arguments, the jury deliberated and sent the court the following questions:

1. Was the Defendant offered a plea deal?

2. If so, what was the offer?

3. What plea deal were the other male defendants offered/agreed to?

The circuit court responded, "You must rely on the evidence already submitted to you." The jury reconvened and returned a verdict of guilty of capital murder. After the circuit court denied Kelly's motion for judgment notwithstanding the verdict or a new trial, Kelly appealed. He raises two issues: whether the circuit court erred in refusing his abandonment-

8

defense jury instructions and whether the circuit court erred in refusing Kelly's manslaughter jury instruction.

## Standard of Review

¶19. We review the decision to give or refuse a jury instruction for abuse of discretion. *Taylor v. State*, 246 So. 3d 936, 938 (¶6) (Miss. Ct. App. 2018). "The instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Thomas v. State*, 145 So. 3d 687, 690 (¶4) (Miss. Ct. App. 2013) (quoting *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010)).

## Discussion

¶20. In *Lenard v. State*, 51 So. 3d 239 (Miss. Ct. App. 2011), we discussed the law concerning appellate review of refused jury instructions. *Id.* at 244 (¶16). We noted that refused instructions must be considered along with all other instructions to determine if there was error. *Id.* A defendant is entitled to a jury instruction on his theory of the case when certain facts are presented that are reasonably related to his defense. *Id*. at (¶17). But even though a defendant may theoretically be entitled to a jury instruction on his theory of the case, "this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Nelson v. State*, 284 So. 3d 711, 716 (¶18) (Miss. 2019) (internal quotation mark omitted) (quoting *Bailey v.* State, 78 So. 3d 308, 315 (¶20) (Miss. 2012)). Keeping these principles in mind, with the key being whether there is evidence in the record to support an

instruction, we turn to the jury instructions Kelly claims were erroneously refused.

### I. Whether the circuit court erred in refusing Kelly's proposed instructions on abandonment.

¶21.  Kelly argues that he is not guilty of the crime of attempted burglary because he abandoned the burglary plan.  Therefore, he says, he could not be guilty of murdering someone while committing the crime of attempted burglary.  He claims that the circuit court erred in refusing to instruct the jury on his abandonment defense.[10]  We disagree.

---

[10] The abandonment instructions that the circuit court refused were:

D-27

It is not an attempt to commit a crime if the defendant abandoned his attempt to commit the offense or otherwise prevented its commission under circumstances indicating a complete and voluntary renunciation of his criminal purpose.

D-30

The Court instructs the jury that the abandonment of a criminal enterprise prior to the completion of the crime may, under certain circumstances, be a valid defense to a criminal charge. If a person becomes engaged in a criminal enterprise and before completion of that enterprise, that person completely renounces and abandons the criminal enterprise voluntarily and of his own free will without intervention from legal authorities or for any other reason, then that person shall not be held criminally liable for any actions committed thereafter by his accomplices.

        If you believe that Demarco Kelly did, on July 12, 2015, unlawfully, wilfully, and feloniously embark upon a criminal enterprise with another person or persons, that enterprise being the commission of a burglary, and if you believe that Demarco Kelly renounced and abandoned that criminal enterprise voluntarily and of his own free will without the intervention of any legal authority or for any other reason, then you may not find Demarco Kelly guilty of capital murder.

D-31

        When there is a break in the chain of events leading from the initial felony, as by Demarco Kelly's abandonment of the original criminal activity,

¶22. A failed attempt to commit a crime is still a punishable offense under Mississippi Code Annotated section 97-1-7(1) (Rev. 2014):

> Every person who shall design and endeavor to commit an offense, and shall do any overt act toward the commission thereof, but shall fail therein, or shall be prevented from committing the same, on conviction thereof, shall, where no other specific provision is made by law for the punishment of the attempt, be punished by imprisonment and fine for a period and for an amount not greater than is prescribed for the actual commission of the offense so attempted.

"An attempt to commit a crime consists of three elements: (1) an intent to commit a particular crime; (2) a direct ineffectual act done toward its commission; and (3) the failure to consummate its commission." *Brooks v. State*, 18 So. 3d 833, 841 (¶33) (Miss. 2009).

¶23. Abandonment is a defense to an attempted crime, but to be entitled to a jury instruction on abandonment, there must be evidence in the record to support it and create a jury question. For example, in *Ross v. State*, 601 So. 2d 872 (Miss. 1992), Ross was convicted of attempted rape. *Id*. at 872. On appeal, the record shows that Ross came to Dorothy Henley's trailer, purportedly seeking directions. *Id.* When Henley stepped outside to help him, Ross pulled a gun on her, forced her back inside, and ordered her to undress. *Id*. at 873. She started crying and talking about her daughter and how her daddy was dead and that Henley was all the child had. *Id.* When Ross heard this, he said that if she had a little girl, he would not do anything and left. *Id.* At the end of the trial, the court instructed the jury on the elements of attempted rape. *Id*. at 874. The instructions pointed out that if Ross was prevented from completing the rape by intervening, extraneous causes, then Ross

---

any subsequent homicide committed by him is not within the felony-murder statute.

was still guilty of attempted rape. *Id.* But if the rape was not completed because Ross voluntarily stopped short of the act, then Ross was not guilty. *Id.* The jury convicted Ross, and on appeal, Ross argued that his motion for directed verdict, a challenge to the sufficiency of the evidence, should have been granted. *Id*. at 875. The supreme court said that "the key inquiry is a subjective one: what made Ross leave?" *Id*. The supreme court went on to find that Ross left because he was sympathetic to the victim when she started talking about her daughter. *Id.* "He did not fail in his attack. No one prevented him from completing it." *Id*. The supreme court reversed Ross's conviction, saying that there was sufficient evidence to support Ross's defense that he had abandoned his attempt to rape Henley. *Id.*

¶24. Similarly, in *Pruitt v. State*, 528 So. 2d 828, 831 (Miss. 1988), there was proof that Pruitt had changed his mind about raping Robin Gatlin and abandoned the crime. In that case, Pruitt was convicted of attempted rape when he encountered Robin Gatlin in the ladies room at a lounge in Gulfport. *Id*. at 829. Pruitt grabbed her by the throat and told her to undress. *Id*. Gatlin began to talk to Pruitt and offered to have a drink with him. *Id*. Pruitt released her and told her she was free to leave, but Gatlin was afraid to go. *Id*. At that moment, Deborah Smith entered the ladies room, and Gatlin asked her not to leave. *Id*. As Pruitt and Gatlin were leaving the restroom, Gatlin told Smith that she would have a drink with her in a few minutes. *Id.* at 830. Pruitt and Gatlin then left and sat at the bar. *Id*. Smith sat at the other end of the bar and then reported the couple's odd behavior to the doorman. *Id*. Gatlin came to Smith and told her what had happened. *Id.* Pruitt was charged with attempted rape and convicted. *Id* at 829. On appeal Pruitt argued the defense of

12

abandonment. *Id*. at 831. On appeal, the supreme court reversed Pruitt's conviction and said:

> It is clear that Pruitt did not accomplish his intent; it is uncontradicted that he voluntarily announced to Ms. Gatlin that he had given up his intent before Ms. Smith entered the bathroom. Under our attempt statute, Miss. Code Ann. § 97-1-7 (1972), prevention or frustration must have resulted from extraneous causes. Although Ms. Smith did enter the bathroom, she did so after Pruitt abandoned his intent—an abandonment which he not only announced to Ms. Gatlin, but also which he evidenced by the fact that he did not touch her after he released his hand from her throat; neither did he continue in his efforts to disrobe her nor did he disrobe himself or expose himself. Ms. Gatlin's resistance was ineffective to prevent Pruitt from raping her, since he obviously was able to physically dominate her under the surrounding circumstances. The facts are not such that the jury in this case could have found beyond a reasonable doubt that Pruitt did not voluntarily abandon his attempt to rape Robin Gatlin.

*Id.* at 831.

¶25. The defense of abandonment is often intertwined with proof of the second element of attempt, namely whether the defendant actually made an overt act toward the completion of the crime, or whether he abandoned the crime before completion. In *Bucklew v. State*, 206 So. 2d 200 (Miss. 1968), the mayor of Laurel was charged with attempted embezzlement when he had his personal jeep serviced and took steps to have the city pay for it. *Id.* at 201. He obtained the bill that had been sent to the city clerk, took it to the director of the Pest Control Department and asked him to sign it. *Id*. Thereafter, the mayor signed his name to an approval sheet attached to the bill. *Id.* But a check for the bill, which would have required the mayor's signature, was never processed. *Id*. The mayor was later charged with attempted embezzlement. *Id*. At his trial, the mayor moved to exclude the evidence, saying that the State had failed to prove an overt act toward the commission of a crime. *Id*. The

13

circuit court denied the mayor's motion, and the jury convicted him. *Id*. at 202. The issue on appeal was the following: "[D]id the State show that the defendant committed an overt act in an attempt to commit the crime of embezzlement?" *Id.* After reviewing the elements of attempt to commit a crime (intent, a direct effectual act done toward commission, and a failure to consummate the commission), the Mississippi Supreme Court outlined what constituted an overt act toward the commission of a crime:

> [A]n attempt is a direct movement toward the commission of the crime after the preparations have been made; that the defendant's act must be a direct, unequivocal act toward the commission of the intended crime; that his acts must have progressed to the extent of giving him power to commit the offense and nothing but an interruption prevented the commission of the offense; that the defendant's act must reach far enough toward the accomplishment of his intention to commit the offense to amount to a commencement of the consummation or to be a step in the direct movement toward its commission; and that some appreciable fragment of the crime must be committed so that the crime would be completed if the defendant were not interrupted.

*Id.* at 202-03. The court also said:

> Abandonment is a defense if the attempt to commit a crime is freely and voluntarily abandoned before the act is put in process of final execution, if there is no outside cause prompting the abandonment. On the other hand, a voluntary abandonment of an attempt which has proceeded beyond mere preparation will not bar a conviction for the attempt.

*Id.* at 204 (citing 22 C.J.S. *Criminal Law* § 76 (1961)). The court went on to say that the proof showed that, although the mayor got the Pest Control Director to sign the bill, the mayor himself did not submit the bill for payment and that there was nothing in the record to show any extraneous cause that prevented the mayor from doing so. *Id*. at 203. Thus, the mayor had abandoned any intended embezzlement. *Id.*

¶26. Abandonment is also related to the third element of an attempted crime, namely the

14

failure to consummate the planned crime. In *Powers v. State*, 883 So. 2d 20 (Miss. 2003), Powers was charged and convicted of capital murder when he killed his victim while attempting to rape her. *Id*. at 23 (¶1). The court said:

> As to the third factor, the Mississippi attempt statute requires that the third element, failure to consummate, result from extraneous causes and not a voluntary cessation. *Ross v. State*, 601 So. 2d at 874 (citing *West v. State*, 437 So. 2d 1212, 1214 (Miss. 1983)). By Powers's own admission, there was a struggle over the gun between the two. The shooting and resulting death of the victim is the extraneous cause in this case.

*Id.* at 27 (¶16).

¶27. Similarly the defense of abandonment was rejected in *Christian v. State*, 207 So. 3d 1207 (Miss. 2018). There Travaris Christian was convicted for the capital murder of Robert Carter and his fiancée, Ranita Marks, who were found in their home, shot, and killed. *Id.* at 1209 (¶¶1-2). Travaris's uncle, Alonzo Christian, testified that his nephew assisted Deon Carter in Deon's plan to rob Carter's brother, Robert. *Id.* at 1211 (¶10). Alonzo dropped off both Travaris and Carter at Robert's home and left. *Id*. Travaris gave three different statements about what happened. In one statement, he did not even meet Deon until after the burglary/shooting. *Id*. at 1210 (¶7). In a second, Travaris stayed in the truck driven by Deon to Robert's while Deon went inside and Travaris ran when he heard gunshots. *Id*. at (¶8). In the third, Travaris said he accompanied Deon to the door where Deon and Robert argued, Deon shot through the door, and Travaris ran. *Id*. at (¶9). Travaris did not testify at trial. *Id.* at 1212 (¶8). Other evidence entered included testimony from law enforcement about finding Marks's cell phone in Travaris's pocket. *Id*. at 1212 (¶15). Also, although the gun that was used in the shooting was found in a place where Deon was staying, Travaris

admitted in a recorded conversation that he (Travaris) was the last one to touch it, and his fingerprints were all over it. *Id.* at (¶6). A jury found Travaris guilty. On appeal, Travaris argued that the circuit court erred in denying his abandonment instruction. *Id.* at 1221 (¶69). The supreme court found no error and said:

> Here, no evidentiary basis existed to find Christian "voluntarily and of his own free will" abandoned the crime of "house burglary" prior to its commission. This Court has held that for an abandonment instruction to be warranted, the evidence must show that the defendant voluntarily abandoned his intent and did "not have his intent frustrated by the resistance of the victim . . . ." *Pruitt v. State*, 528 So. 2d 828, 831 (Miss. 1988). Further, as Nichols recognized, "a conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme which he has helped to devise and carry forward because as the result of fear or even of a better motive he concludes to run away. . . ." *Nichols*, 230 N.Y. at 230, 129 N.E. 883.
>
> Christian's alleged abandonment, under the most favorable aspect of the evidence, would not permit a jury to say that he had effected any such retirement from the criminal plan to which he was a party after the first shot was fired by Deon.

*Id.* at 1222 (¶¶72-73).

¶28. Somewhat similar to this case is *Kizart v. State*, 795 So. 2d 582 (Miss. Ct. App. 2001). There, the defendant argued that he was entitled to an abandonment instruction when he stopped trying to hijack a car because the doors were locked. *Id.* at 584 (¶6). But seated in the front passenger side of the car was an elderly man who fended off Kizart's attempt to unlock the door when Kizart tried to go through the window that was open about eight inches. *Id.* at 583 (¶3). We held:

> [I]t is clear that he [Kizart] ceased his efforts because the victim . . . prevented him from furthering the attempt. The denial of the jury instruction on abandonment does not, therefore, warrant reversal.

16

*Id.* at 584 (¶8) (internal quotation marks omitted).

¶29.    Here, Kelly argues there was proof in the record from which the jury could have concluded that he abandoned the attempted burglary before any shooting occurred. Kelly says that according to Brandon, there was no one outside when he and Taylor opened the door and that they heard no one running. Thus, Kelly says, the jury could have believed that they voluntarily left after the door would not open. Supporting this contention, he says, is Tonisha's and Kyra's testimony that if the door were locked, the plan was to try the robbery another day.

¶30.    But Kelly himself says in his third statement that the group ran after they heard someone inside ask who was at the door. If they had defaulted to the original plan, they would have left after they found the door was locked. Yet in his own statement, Kelly said both he and Metcalf kicked the door, trying to get in. Kelly and the others knew that there were people inside—they had actually seen Brandon Woods enter—and Kelly heard someone ask who was kicking at the door. Only upon hearing this question did Kelly leave, shooting as he retreated. Thus, the record shows that by his own words, Kelly left, not voluntarily, but because he was prompted by an outside cause. The shooting clearly occurred during the attempted burglary when Kelly and the others left the front door due to the extraneous cause of hearing the intended victims approaching and asking who was at the door. Accordingly, we find the circuit court did not err in concluding that nothing in the evidence presented supported abandonment instructions.

> **II.    Whether the circuit court erred in refusing Kelly's manslaughter instruction.**

17

¶31. Kelly argues that the circuit court erroneously rejected his proposed culpable-negligence manslaughter instruction. Again the circuit court held that there was nothing in the record to support Kelly's proposed instruction. We agree with the circuit court. Because Kelly had no defense to the attempted burglary charge and because any killing during the commission of the attempted burglary qualifies as capital murder, Kelly was still potentially guilty of capital murder whether or not a manslaughter instruction had been given.

¶32. First- and second-degree murder as well as capital murder are defined in Mississippi Code Annotated section 97-3-19 (Rev. 2014) as follows:

> (1) The killing of a human being without the authority of law by any means or in any manner shall be murder in the following cases:
>
>> (a) When done with deliberate design to effect the death of the person killed, or of any human being, shall be first-degree murder;
>>
>> (b) *When done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual, shall be second-degree murder*;
>>
>> (c) When done without any design to effect death by any person engaged in the commission of any felony other than rape, kidnapping, burglary, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or felonious abuse and/or battery of a child in violation of subsection (2) of Section 97-5-39, or in any attempt to commit such felonies, shall be first-degree murder; [capital murder]
>>
>> (d) When done with deliberate design to effect the death of an unborn child, shall be first-degree murder.
>
> *(2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases: . . .*
>
>> *(e) When done with or without any design to effect death, by any person*

18

> *engaged in the commission of the crime of . . . burglary, . . . robbery . . .*
> *or in any attempt to commit such felony.*

(Emphasis added).

¶33.    Heat-of-passion manslaughter is defined in Mississippi Code Annotated section 97-3-35 (Rev. 2014) as "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." Any other killing falls under Mississippi Code Annotated section 97-3-47 (Rev. 2014), which includes culpable-negligence manslaughter:

> Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter.

¶34.    In Kelly's case, the court gave instructions on capital murder and second-degree murder:

Jury Instruction C-13

> The Defendant, Demarco Kelly, has been charged by indictment with the crime of capital murder of Andre Stephen Taylor, Jr.

> If you find from the evidence in this case beyond a reasonable doubt that:
> 1. On or about the 12th day of July, 2015 in Itawamba County, Mississippi;
> 2. Andre Stephen Taylor, Jr. was a human being; and
> 3. With or without any design to effect death and without authority of law, and not in necessary self-defense, Demarco Kelly did, or in concert with another, kill Andre Stephen Taylor, Jr.;
> 4. While Demarco Kelly was engaged in the commission of the crime of attempted burglary of a dwelling;

> Then you shall find the Defendant, Demarco Kelly, guilty of the capital

19

murder of Andre Stephan Taylor, Jr.

If the prosecution has failed to prove any one or more of the above listed elements beyond a reasonable doubt, then you shall find the Defendant, Demarco Kelly, not guilty of the capital murder of Andre Stephen Taylor, Jr.

Jury Instruction C-14

If you find that the State has failed to prove any one or more of the essential elements of capital murder, you will then proceed with your deliberations to decide whether the State has proved beyond a reasonable doubt all of the elements of the lesser crime of second-degree murder.

If you find from all the evidence in this case beyond a reasonable doubt that the Defendant, Demarco Kelly, while in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design, did cause the death of Andre Stephen Taylor, Jr., then you shall find the Defendant guilty of second-degree murder.

If the State has failed to prove any one or more of these elements beyond a reasonable doubt then you shall find the Defendant Demarco Kelly not guilty of second-degree murder.

If you find beyond a reasonable doubt from the evidence in this case that the Defendant is guilty of the crime charged or a lesser crime as defined herein, but you have a reasonable doubt as to the crime of which the Defendant is guilty, you must resolve the doubt in favor of the Defendant and find him guilty of the lesser crime.

¶35.   Kelly proposed the following culpable-negligence manslaughter instruction:

Instruction D-21A

The Court instructs the jury that if the State has failed to prove any one or more of the essential elements of the crime of Capital Murder beyond a reasonable doubt and therefore you do not find the defendant guilty of Capital Murder, and if the State has failed to prove any one or more of the essential elements of the crime of First Degree Murder and therefore you do not find the Defendant guilty of First Degree Murder, and if the State has failed to prove any one or more of the essential elements of the crime of Second Degree Murder and therefore you do not find the Defendant guilty of Second Degree

20

Murder, you may consider the lesser charge of Manslaughter.

If that is the case, you shall proceed with your deliberations to decide whether the State has proved beyond a reasonable doubt all of the elements of the lesser crime of Manslaughter.

If you believe from the credible evidence in this trial, beyond a reasonable doubt, that Demarco Kelly did, on or about July 12, 2015, in Itawamba County, Mississippi, without authority of law, and not while engaged in the commission of attempted burglary of a dwelling, with culpable negligence, kill Andre Stephan Taylor, Jr., a human being, you may find Demarco Kelly guilty of Manslaughter.

If the State has failed to prove any one or more of these elements beyond a reasonable doubt then you shall find Mr. Kelly not guilty of Manslaughter.

After hearing arguments of counsel, the circuit court refused D-21(a), saying that "there was nothing in the record to support culpable negligence or any kind of negligence in this case."

¶36. In *McCarty v. State*, 247 So. 3d 260 (Miss. Ct. App. 2017), we discussed several issues relevant to the case at hand, including the difference between depraved-heart (second degree) murder and culpable-negligence manslaughter. We noted:

> Depraved-heart murder and culpable negligence manslaughter are distinguishable simply by degree of mental state of culpability. In short, depraved-heart murder involves a higher degree of recklessness . . . ." *Hawkins v. State*, 101 So. 3d 638, 643 (¶17) (Miss. 2012). The Supreme Court has described conduct "evincing a depraved heart" as "grave recklessness manifesting utter disregard or indifference to [a] resultant creation of eminent danger to [human] life." *Windham v. State*, 602 So. 2d 798, 802 (Miss. 1992). "Depraved-heart murder encompasses 'a reckless and eminently dangerous act directed toward a single individual,' from which malice is implied." *Holliman v. State*, 178 So.3d 689, 698-99 (¶20) (Miss. 2015).

*Id*. at 269 (¶27). Culpable negligence, which is "negligence of a degree so gross as to be tantamount to a wanton disregard, or utter indifference to, the safety of human life," simply

involves a lesser degree of recklessness than that found in depraved heart murder. *Id.* at 270 (¶29).

¶37. Had the State sought a conviction for first-degree murder, then a manslaughter instruction might have been appropriate because manslaughter is considered a lesser-included offense of first-degree murder. *Shumpert v. State*, 935 So. 2d 962, 968 (¶16) (Miss. 2006). But instead, the State presented a capital murder instruction because Taylor was killed while Kelly was attempting to burgle and rob Taylor. Mississippi Code Annotated section 97-3-19(2)(e) specifically enumerates the felonies or attempted felonies that give rise to capital murder, including burglary and robbery. In *Pickle v. State*, 345 So. 2d 623 (Miss. 1977), the Mississippi Supreme Court explained why capital murder includes a killing during an attempted crime:

> If the crime of capital murder could not be sustained unless the homicide occurred during the actual attack upon a victim or during the actual burglary, kidnapping, arson or robbery, such could be an inducement for an assailant to kill his victim after the commission of the first crime in order to silence her/him as a witness. The rule stated in the foregoing cases is the more reasonable, and we hold that where the two crimes are connected in a chain of events and occur as part of the res gestae, the crime of capital murder is sustained.

*Id.* at 626-27. Therefore, in this case, it does not matter whether Taylor was killed during the commission of a burglary or during the commission of an attempted burglary. The result is the same—the guilty party has still committed a capital murder under section 97-3-19(2)(e) even if a jury were to find he was merely attempting a burglary.

¶38. The issue becomes whether Kelly was entitled to a manslaughter instruction when he was charged with capital murder and, in fact, had no defense to the underlying felony. This

22

issue was addressed by our supreme court in *Ronk v. State*, 172 So. 3d 1112, 1126 (¶23) (Miss. 2015). There, the defendant was charged with the capital murder of Michelle Craite with the underlying felony of arson. *Id*. at 1124 (¶14). Ronk explained that they had argued and that Craite had tried to stab him with a knife. *Id*. at 1123 (¶11). After disarming her, he stabbed her. *Id*. He then spilled gasoline over the house and set it on fire. *Id*. The medical examiner testified that Craite had serious stab wounds but was alive when the fire was set. *Id*. at 1121 (¶2). Ronk requested an imperfect self-defense instruction of manslaughter which the circuit court denied. *Id*. at 1125 (¶19). On appeal, the supreme court concluded that Ronk was not entitled to the manslaughter instruction because "[u]nlike other sections of the capital murder statute, Subsection 2(e) does not require the prosecution to prove the elements of murder, only that a killing took place while the accused was 'engaged in the commission' of the enumerated felonies." *Id*. "If the jury found that Craite's death occurred while Ronk was engaged in the commission of an arson, the fact that the killing was a manslaughter rather than a murder would have no effect on his guilt under Section 97-3-19(2)(e)." *Id*. at 1127 (¶23).

¶39. Kelly was charged with, and the State sought conviction of, capital murder under section 97-3-19(2)(e), and the State was not required to prove the elements of the other forms of murder. Rather, the State needed only to prove that Taylor was killed during an attempted burglary by Kelly. Because we have held that Kelly had no defense to the attempted burglary charge (i.e., he did not abandon the attempted burglary), Kelly is not entitled to a manslaughter instruction either. The *Ronk* court said:

23

Even if the jury accepted Ronk's theory of imperfect self-defense, such a finding would lower his culpability for Craite's death to manslaughter, which is a "killing of a human being without the authority of law." *See* Miss. Code Ann. § 97-3-19(2) (Rev. 2014). No evidence was presented which would have allowed the jury to separate the killing from the arson and convict Ronk only of manslaughter. Accordingly, we hold that the trial court did not err in denying Ronk's imperfect-self-defense manslaughter instruction.

*Id*. at 1127-28 (¶27). *See also, e.g.*, *Jacobs v. State*, 870 So. 2d 1202, 1209 (¶19) (Miss. 2004) ("Therefore, because Jacobs was found guilty of robbery, and the death resulted in the commission of the robbery, Jacobs is guilty of capital murder regardless of whether a lesser-included offense instruction [on manslaughter] is given."). In this case, no evidence was presented from which the jury could separate Taylor's killing from Kelly's attempted burglary. Because Kelly had no defense to the underlying felony, Kelly was still guilty of a capital murder. We find no error by the circuit court in refusing Kelly's manslaughter instruction.

### Conclusion

¶40. We find no error by the circuit court in refusing Kelly's proposed jury instructions on his abandonment defense and on culpable manslaughter. Accordingly we affirm Kelly's conviction and sentence.

¶41. **AFFIRMED.**

**CARLTON, P.J., GREENLEE, WESTBROOKS, LAWRENCE AND McCARTY, JJ., CONCUR. BARNES, C.J., AND WILSON, P.J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

24